CABLE VISION, INC., et al., Plaintiffs,

v.

KUTV, INC., the KLIX Corporation, et al., Defendants.

No. 3546.

United States District Court
D. Idaho, S. D.

July 30, 1962.

Supplemental Opinion Nov. 6, 1962.

Parry, Robertson & Daly, Twin Falls, Idaho, Luxon & Scribner, Helena, Mont., Smith & Pepper, Washington, D. C., George Schiffer, New York City, for plaintiffs.

Benoit & Benoit, Twin Falls, Idaho, McMillan, Cannon, Browning, Jenkins & Alston, Salt Lake City, Utah, Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., for defendants.

SWEIGERT, District Judge.

## BACKGROUND OF THE LITIGATION

This is one of a series of cases brought to test the rights of so-called community antenna services to pick up the broadcasts of regularly licensed television stations for commercial distribution to their subscribers.

In the first three cases of the series [1] the question presented was whether a

1. Intermountain Broadcasting & Television Corp. v. Idaho Microwave et al. (KUTV, Inc. v. Idaho Microwave et al.; Radio Service Corporation of Utah v. Idaho Microwave et al.), D.C., 196 F. Supp. 315.

community antenna service in Twin Falls, Idaho, could, without the consent of three network affiliate stations in Salt Lake City, Utah, each of which held contractual rebroadcast arrangements with a local Twin Falls, Idaho, station, pick up the broadcasts of the Salt Lake City stations for distribution to its community antenna subscribers in Twin Falls.

In those cases this Court held upon a motion for summary judgment that the pick up of the Salt Lake City broadcasts by the community antenna for such purpose did not, under the circumstances, amount to unfair competition with the Salt Lake City stations within the doctrine of International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) and related cases. (See previous Opinion of this Court reported in Intermountain Broadcasting & Television Corp. v. Idaho Microwave, et al., 196 F.Supp. 315 (D.Idaho, 1961)).

In its previous opinion this Court expressly noted that no exclusive license rights were relied upon by the Salt Lake City stations in those cases and, further, that the existence of possible exclusive license rights was not sufficiently documented in those cases to justify a determination on that ground by summary judgment.

In the present case the same community antenna operators, Cable Vision, Inc., and Microwave, Inc., defendants in the previous cases and plaintiffs in the present case, commenced this action upon anti-trust grounds against the Twin Falls station, KLIX-TV, mentioned in but not a party to the previous actions and a defendant here.

■ This defendant, Twin Falls Station, KLIX, has counterclaimed in this action against the community antenna operators, the plaintiffs, alleging, inter alia, that station KLIX, Twin Falls, has certain contractual exclusive rights to the first run of certain programs in the Twin Falls area and that the activities of the community antenna operators— picking up the same programs as broadcast by the Salt Lake City stations for simultaneous distribution to its Twin Falls subscribers—constitutes tortious interference with such contractual rights and, further, constitutes unfair competition under the particular circumstances here presented. Accordingly, counterclaimant, KLIX has applied for a preliminary injunction against the plaintiffs.[2]

## THE FACTUAL SITUATION

A good deal of the factual background of the operations here involved is set forth in our previous opinion but it is necessary to mention some other aspects in order to differentiate this case, and the relationship of the parties here, from the previous cases.

In the first place it will be observed that the dispute here is not between Salt Lake City broadcasting stations and a Twin Falls, Idaho, community antenna service, as in the previous cases, but between KLIX, Twin Falls, the broadcaster, and the Twin Falls community antenna service.

Counterclaimant, KLIX, Twin Falls, claims certain contracts with the three national network organizations, Columbia Broadcasting Company, National Broadcasting Company and American Broadcasting Company and also with certain film distributors, which either expressly, or impliedly in the light of a general custom and practice in the indus-

2. JURISDICTION—Since this case arises under the anti-trust laws of the United States, Sections 1, 2, 15 and 26 of Title 15 U.S.C.A., this Court has jurisdiction under Title 28 U.S.C. § 1331, and may, therefore, exercise its ancillary jurisdiction over defendant's counter-claim, which plaintiffs have conceded to be compulsory (R.T. 260-1), even though that counter-claim alleges no independent grounds of federal jurisdiction. Moore v. N. Y. Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926).

The law of Idaho would be applicable to determine the merits of defendant's counter-claim under the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which we interpret broadly to authorize the applicability of state law to all non-federal issues, re-

try, grant to it the exclusive right of first run of network and film programs in the Twin Falls area.[3]

As pointed out in this Court's previous opinion, the transcontinental circuits do not reach Twin Falls and for that reason KLIX-TV has arranged to obtain the consent (required by Sec. 325(a), Federal Communications Act of 1934, 47 U.S. C.A. § 325(a)) of three Salt Lake City broadcasting stations, KSL-TV, JUTV and KTVT, also affiliates of the network organizations, to pick up their Salt Lake City network broadcasts by means of the KLIX antenna outside Twin Falls for rebroadcast over KLIX to the Twin Falls television area.

KLIX, Twin Falls, cannot pick up for live rebroadcast more than one such Salt Lake City signal at a time. When KLIX selects one such Salt Lake signal from two or more simultaneous signals, KLIX must normally let the other signal or signals go, although sometimes KLIX records one of the others on video tape for a delayed rebroadcast over KLIX.

Without a community antenna facility Twin Falls area television viewers would not ordinarily be able to receive the Salt Lake City signals on their home sets. To receive these Salt Lake City signals on their home sets Twin Falls area residents would need antenna larger, stronger and more sophisticated than the usual rabbit ear or roof aerial home antenna.

Thus, without community antenna service Twin Falls area home viewers would ordinarily be restricted to whatever single network program from a Salt Lake City Station was being rebroadcast over KLIX, Twin Falls, at any given time.

To provide Twin Falls home viewers with a wider range of choice a community antenna service, operated in part through the facilities of plaintiffs, Cable

Vision, Inc., and in part through the facilities of Microwave, Inc., a common carrier, has been established in Twin Falls.

Cable Vision, Inc., picks up the Salt Lake City signals on its own specially constructed antenna outside Twin Falls and brings the signals via the common carrier microwave facilities of co-plaintiff, Microwave, Inc., and its own cable facilities, into Twin Falls and to the home sets of such Twin Falls television viewers as are its subscribers.

The community antenna operators exercise their own judgment as to the signals and programs that will be distributed to their subscriber sets. In the course of such distribution the selected signals are demodulated and otherwise electronically treated and regenerated and in some instances converted into different channels and frequencies than those on which they have been transmitted by the originating station.

The community antenna service solicits subscribers by advertisements to the effect that the service brings them more television programs, naming the various popular ones, than they would otherwise be able to receive. At certain intervals, when the community antenna service has a temporarily vacated channel on its own system, it introduces music originating from its own tapes or records. Subscribers are charged a fee of approximately $100 for an initial hook-on to the system and a recurring monthly charge of $4–5 a month. The service is admittedly commercial and its operators expect to realize a profit.

The community antenna service cable is connected to the home sets of its subscribers in such manner that the subscriber may dial directly, without need of any other antenna at all, to any of the three major network programs being

gardless of the source of this Court's jurisdiction.

3. Since the claimed exclusive rights to network programs under contracts with the network organizations are primarily involved—and since the determination of

the issues with respect to such claims will be determinative of the issues with respect to contracts with film suppliers, we will refer in this memorandum opinion only to the network programs until otherwise noted.

broadcast from the Salt Lake City stations.

It also picks up whatever local KLIX, Twin Falls, program happens to be on the air and channels it in similar manner to the home sets of its subscribers so that they can dial, if they choose, to KLIX, Twin Falls. In such case, however, the KLIX signal is receivable on a channel different than the channel on which KLIX is actually broadcasting.

It is possible for community antenna subscribers to view KLIX on its own channel but in order to do so the subscriber would have to disconnect his community antenna service attachment and receive the local KLIX signal and program by use of rabbit ear or roof aerial antenna—such as would be used for local reception if there were no community antenna service attachment. There is, however, little occasion for this inconvenient procedure among subscribers because they are able by means of the attachment to dial directly, without any kind of home antenna, not only to any of the three Salt Lake network broadcast programs, but also to KLIX, Twin Falls, programs as rechanneled into their sets by the service.

## BASIS OF STATION KLIX, TWIN FALLS, OBJECTIONS

KLIX does not object to the CATV pick-up of its local KLIX signal so long as the CATV pick-up does not diminish the quality of the signal. The pick-up of the KLIX signal, as rechanneled into home sets through the community antenna service, presents to the viewer, who chooses to dial to it, the identical KLIX, Twin Falls, programs on the air at the time, including, of course, such local commercials on behalf of Twin Falls sponsors and advertisers as KLIX inserts in and after the network programs.

KLIX does, however, object to the pick-up by the community antenna service of the Salt Lake City signals for distribution of the Salt Lake network programs to its subscriber sets simultaneously with rebroadcast by KLIX of the same network program.

Such a duplication of such network programs to community antenna subscribers enables them to choose among Salt Lake City network programs simultaneously on the air with the same network programs as rebroadcast by KLIX.

The basis of the KLIX objection to such duplication is the fact that, when the network program is viewed directly as it is broadcast from Salt Lake City, it appears to the viewer with commercials inserted, not by KLIX for its local sponsors, but by the various Salt Lake stations for their own sponsors. Station KLIX contends that this practice of the community antenna service prevents KLIX from assuring its local sponsors and advertisers that their commercials, placed with KLIX, are being seen as they would normally be seen but for such duplication, and that KLIX is subjected to reduction of the number of its television viewers and, in turn, to loss of commercial advertising revenue.

Thus, KLIX contends, it is prevented by tortious interference and unfair competition of the community antenna from enjoying the fruits of its own contractual arrangements with the networks for the first run of network programs in the community of Twin Falls.

■ It is a matter of judicial notice, amply shown by the record here, that under our present national policy of free radio and television reception through a system of commercially competitive broadcasting stations, a television broadcast station, being unable to charge the public for reception of its programs, must necessarily maintain itself through revenues from sponsors willing to buy time intervals allowed before, during and after programs for commercial advertising purposes. The ability of a broadcasting station to attract and maintain such commercial advertising revenue depends upon the extent to which it can assure sponsors that its programs, and the spotted commercials presented therewith, are being viewed by the television public.

For these reasons such rights of exclusive first run as a broadcaster can

validly obtain for its programs have commercial significance and value.

## EXCLUSIVITY

The contractual arrangement between KLIX and the national networks, so far as exclusivity is concerned, is shown by its existing contracts and by evidence of a generally recognized trade practice. That arrangement is that KLIX, Twin Falls, is granted by the network organizations the first call in its community, i. e., Twin Falls, Idaho, the community specified in the contracts, upon the programs of the networks. In the custom of the industry, the networks preclude themselves from licensing a simultaneous broadcast of their programs by any other station in that community.

Any exclusivity agreement broader than that would be, not only in conflict with, but in violation of the national television policy as declared by the regulations of the Federal Communications Commission.

Prior to 1955 the national policy permitted agreements between networks and stations under which the networks could grant first call upon their programs within what was described as the station's "primary service area". This was found by the Federal Communications Commission to be unduly restrictive with respect to stations located in another community but within the same service area. (See, Barrow Report, p. 265 et seq., Def.'s Ex. 21).

Accordingly, the regulation of the Federal Communications Commission was changed to prohibit all contracts or arrangements between network organizations and broadcasting stations which prevent or hinder another broadcasting station in the same community from broadcasting network programs not taken by the former station or which prevents or hinders another broadcast station in a different community from broadcasting any program of the network organization—but with the express proviso that: "This section shall not be construed to prohibit any contract, arrangement or understanding between a station and a network organization pursuant to which *the station is granted the first call in its community upon the programs of the network organization.* As employed in this paragraph, the term 'community' is defined to be the community specified in the instrument of authorization as the location of the station." (emphasis ours). (FCC, Regulations, Sec. 3.568, Subsection B).

It will be observed that the degree of exclusivity permissible under this regulation is quite limited. For example, the present national policy clearly contemplates that there will be broadcast stations licensed by the network organizations in different communities but within the same general service area whose simultaneous broadcasts of network programs may overlap both communities without violation of any valid network station exclusivity arrangement.

In the present case the record shows that network programs broadcast from network affiliate stations, not only in Salt Lake City, over 200 miles away, but in Idaho Falls, 160 miles away, and Boise, 120 miles away, can be received by means of adequate antenna in the Twin Falls area simultaneously with any KLIX, Twin Falls broadcast of the same network program.

Certainly, KLIX should not be permitted to assert any right of exclusivity against a community antenna more broadly than it could be asserted against the network organization or another broadcasting station.

Further, present national policy contemplates there may be stations licensed in the *same community* entitled to broadcast the same network programs without violation of any valid exclusivity arrangement.

Here again, KLIX should not be permitted to assert exclusivity against a community antenna service any more broadly than it could be asserted against the networks and other broadcasters.

■ However, to the extent that KLIX has acquired by contract with the networks the first call in its community

upon their programs and to the extent that KLIX actually exercises its right of first call in its community, and to that extent only, it has a contractual exclusivity arrangement that is permissible and valid under the express provisions of the above regulation.

### NATIONAL CONTROL OVER EX-CLUSIVITY

It is true that this limited contractual exclusivity right asserted by KLIX in the pending case lies within a field preempted by the national government through the Federal Communications Act of 1934, Title 47 U.S.C.A., Chapter 5, §§ 151–609.

■ The Act was adopted for the stated purpose of regulating interstate commerce in communications by wire and by radio (which includes television) so as to make available as far as possible, to all the people of the United States, a rapid, efficient nationwide wire and radio communications service with adequate facilities through a Federal Communications Commission to execute and enforce the provisions of the Act.

Subchapter III of the Act, dealing with radio and television, declares the purpose thereof to be to maintain control of the United States over all channels of interstate radio transmission and to provide for the use thereof, but not the ownership thereof, by persons for limited periods under licenses granted by federal authority, no such license to be construed to create any right beyond the terms, conditions and periods of the license. (F.C.A., 47 U.S.C.A. § 301).

The exercise of power by the Federal Communications Commission to regulate the extent to which network organizations may enter into so-called exclusivity arrangements with broadcasting stations has been reviewed and approved by the Supreme Court (National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1942).

It follows that the existence, extent and validity of any exclusivity arrangement claimed by KLIX to exist between it and the network organizations depends upon the extent to which such arrangement conforms to the federal policy.

In this case KLIX asserts a contractual exclusivity which is expressly permissible, valid and in conformance with present national policy.

■ Any property right of exclusivity which KLIX acquires under its network arrangements is not a property in the sense of ownership of any channel of television transmission nor is it a property right created by or derived from its broadcasting license. No such property right or ownership is possible under the national policy. Any property right which KLIX acquires is one that derives from its contractual arrangements with the network organizations for a limited first call exclusivity upon the programs of the latter—a private, commercial arrangement specifically permissible by the Federal Communications Commission.

There is no claim by KLIX that any network organization has violated such grant of first call in their programs. The claim of KLIX is that third persons—the defendant community antenna operators—are unlawfully interfering with private contractual property right of KLIX and unfairly competing with it.

The question, therefore, is whether recognition of such contractual exclusivity right by a court in a suit wherein state common law is applicable and the protection thereof by injunctive relief against the community antenna service under common law doctrines of tortious interference or unfair competition, would invade any preempted field of national jurisdiction or conflict with any phase of national policy.

### STATUS OF COMMUNITY ANTENNA SERVICES

If this Court, recognizing such a contractual right of exclusivity in station KLIX, protects such right by injunction pursuant to these common law doctrines against the community antenna service, the effect will be, of course, to restrict in a certain sense the opportunity of the public in the Twin Falls area to receive

television broadcasts via the facilities of a commercial community antenna service.

The Court has in mind that the Congress has thus far seen fit to impose limitations upon the reception of television broadcasts only in the one respect that one broadcaster may not rebroadcast the program of another without the consent of the latter. (F.C.A., 47 U.S.C.A. § 325(a)).

■■■ As indicated in this Court's previous discussion of the history of this so-called consent provision, community antenna services are not "broadcasters" within the meaning of the definition of "broadcasting" as presently stated in the Federal Communications Act. (F.C.A., 47 U.S.C.A. § 153(a)). The Congress has consistently refused to adopt amendments necessary to make that provision applicable to community antenna services. Community antenna services, therefore, are not required by the Act as presently written to obtain the consent of a broadcasting station before picking up its signal and its programs.

So it is that under present national policy, community antenna services remain a permissible and as yet unregulated means of television reception. Accordingly, the Federal Communications Commission has held that it does not now have jurisdiction over community antenna services.

It should be noted, however, that the Federal Communications Commission has recently requested Congress to grant to it authority to regulate community antenna services by promulgating rules to protect local broadcasting stations against duplication of their programs by community antenna services. See F.C.A., Public Notice B, dated February 23, 1962.

In that notice the Commission expresses its concern over problems posed for the national system of free television by the expansion of community antenna systems into areas already served by a local licensed broadcasting station.

Discussing the very situation presented in our pending case from the point of view of public interest, the Commission calls attention to the serious competitive impact of such community antenna services upon local broadcasting stations and the threatened economic elimination of the latter as a result of community antenna duplication of the very programs upon which the local station relies for its sponsor-advertising revenues—a result which, the commission points out, would completely deprive surrounding rural populations, which are not served by community antenna, and such portion of the urban community population as could not afford the community antenna's monthly service charges, of all television reception, and, further, would deprive the whole community of important local interest programs, local projects, news, weather, etc., which can be provided only by a local broadcasting station.

Indeed, without waiting for a grant of power over community antenna services, the Commission in Carter Mountain Transmission, Docket No. 12931, February 16, 1962, has sought to provide an indirect solution to this problem of public interest by using its power to license common carriers under Subchapter II of the Act. In that case the Commission refused to grant an application by a microwave common carrier to install a microwave relay to convey television signals for a community antenna service, holding that the application should be denied in the public interest until a satisfactory showing be made by the common carrier that the community antenna, which it proposed to serve, has arranged to avoid duplication of the local broadcasting station's programs.

Although these actions and declarations of the Federal Communications Commission are not determinative of the issues of the present case, they do shed light on the problems of public interest involved in the formation of national policy concerning the relationship between community antenna services and local broadcasting stations. Further, they become significant in the light of

the Congressional history on the subject which, as pointed out in the previous opinion of this Court, clearly shows that the Congress, although not ready as yet to extend the consent provision to community antenna, has expressly and specifically disclaimed any intent of affecting one way or the other whatever private property rights may be involved in litigation of this kind between broadcasting stations and community antenna services. Indeed, the present Act, itself, provides that it shall not abridge or alter the remedies now existing in the common law or by statute. (Sec. 414).

It appears, therefore, that community antenna services, although now beyond the reach of the Federal Communications Commission, do not hold under the national policy any favored status that would exempt them from ordinary common law responsibility to others —broadcasting stations or otherwise.

It is true that in a certain sense a community antenna service may be regarded as merely a device through which members of the public are able to accomplish what each might do for himself if possessed of adequate antenna facilities—and this Court so regarded community antenna in the previous related cases.

We there noted, however, the view of the Supreme Court in International News Service, supra, to the effect that the right of the public may be one thing and commercial competition quite another. We did not apply that view in the previous cases for the stated reason (Intermountain v. Idaho, supra, at p. 328 of 196 F.Supp.) that the relationship in that case between the public, the Twin Falls community antenna and the Salt Lake City stations was not fairly comparable with the relationships in the International News case.

In the present case the claims of the broadcasting station, grounded upon a contractual right of exclusivity, are different than the claims of the broadcasting stations in the previous cases wherein no such right was relied upon nor could have been recognized. Likewise, in the present case, the relationship between the community antenna and the broadcasting station—both in competitive posture in the same community "precisely at the point where the profit is to be reaped"—are quite different than the relationships before the Court in the previous cases and is in our opinion fairly comparable to the situation in the International News case.

We believe that in the context of the present case the community antenna service must be regarded as in effect a commercial enterprise in competition with Station KLIX for television viewers —the source of the profit sought by each—and that the community antenna is in effect "reproducing" in the Twin Falls community network programs for which KLIX has acquired a valid, contractual right of first call. (See, re comparable case of "reproduction", Buck v. Jewell-LaSalle Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931)).

STATE v. NATIONAL JURISDICTION

We return now to the question whether under these circumstances recognition of the contractual exclusivity right of KLIX and protection thereof in this case by injunctive relief against the community service would invade any preempted field of national jurisdiction or conflict in any way with national policy.

In cases of obvious conflict with the Federal Communications Act and the federal policy stemming from it, the Courts have declared that the Act constitutes a plenary exercise of the power of the national government to occupy and regulate the field of radio and television and that in such cases state law, common law or statute, is abrogated to the extent that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the Congress. Allen B. Dumont Laboratories v. Carroll, 86 F.Supp. 813 (E.Pa.1949); Farmers Educational & Cooperative Union of America v. WDAY, Inc., N.D., 89 N.W.2d 102, aff'd. 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1958). (See, also, Sola

Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942).

In Standard Radio and Television Co. v. Chronicle Publishing Co., 182 Cal.App. 2d 293, 6 Cal.Rptr. 246, wherein the state court was called upon to determine in the first instance the reasonableness of certain exclusivity arrangements, the Court properly reached the same conclusion.

The Courts have recognized, however, that the Federal Communications Act is not designed primarily as a new code for the adjustment of private rights (Federal Communications Com. v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940) and that state courts, or federal courts, when called upon to apply state law, have jurisdiction to hear and determine private disputes between broadcasting companies and third parties even though the dispute may involve the effect of the Federal Communications Act and Regulations upon those private rights (Regents of New Mexico v. Alberquerque Broadcasting Co., 158 F.2d 900, CCC 10 (1947), or may result in the elimination of a licensed facility (Radio Station WOW v. Johnson, 326 U.S. 120, 65 S.Ct. 1475, 89 L.Ed. 2092 (1944), or may involve enforcement of a contract repudiated by one party to meet licensing conditions imposed by the Federal Communications Commission (Regents of University System of Georgia v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363 (1949)). (See also: U. S. Radio Corporation of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959)).

In the present case the Court is not called upon to determine the reasonableness of the exclusivity arrangement between the broadcasting station and the network organizations from the point of view of the public interest. That determination has already been made by the Federal Communications Commission. The Court, finding and accepting an exclusivity arrangement between KLIX and the network organizations, which is in conformity with national policy, is merely called upon to determine whether KLIX is entitled to protection of that contractual right under such common law doctrines as may be applicable.

Such an approach could not involve confusion between state common law and the national policy on the subject of exclusivity because the state court must accept and recognize only such exclusivity arrangements as are permissible under the national Act, regulations and policy at any given time. Only with respect to the ancillary question of state interpretation and application of the common law doctrine of tortious interference with contractual rights and the doctrine of unfair competition would a lack of uniformity be conceivable.

The only alternative to judicial determination according to the applicable common law would be the determination of all such private disputes over contractual rights between broadcasting stations or between broadcasting stations and others by the Federal Communications Commission.

However, as indicated in the cases cited, the Federal Communications Act was not designed as a code for the determination of such private rights. It is a limited scheme for the regulation of radio and television transmission through the licensing of otherwise freely competitive broadcasting stations whose disputes, among themselves or with others, are beyond the power of the Commission —and for which it has no adjudicatory procedures. There is, therefore, no question here of primary jurisdiction of the Commission as there was in San Diego Building Trades Council v. Gorman, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)—a case arising under the National Labor Relations Act which, unlike the Federal Communications Act, sets up a comprehensive scheme for the investigation, hearing and adjudication of labor disputes.

The difference between the Federal Communications Act and such other more comprehensive regulatory acts has been recognized by the Supreme Court in

United States v. Radio Corp. of America, 358 U.S. 334, 345 et seq., 79 S.Ct. 457, 464, 3 L.Ed.2d 354 (1958), wherein the Court made it the ground for a holding that the primary jurisdiction doctrine did not preclude antitrust suits against broadcasters in the federal courts, saying " * * * the legislative history of the Act (FCA) reveals that the Commission was not given the power to decide antitrust issues as such * * *. Thus, there being no pervasive regulatory scheme, and no rate structures to throw out of balance, sporadic action by the federal courts can work no mischief. The justification for primary jurisdiction accordingly disappears."

The only possible way for the Federal Communications Commission to approach the subject of the present dispute between KLIX, the broadcaster, and Cable Vision, Inc., the community antenna, would be the indirect approach taken by the Federal Communications Commission in the Carter Mountain Transmission case, already noted, wherein a microwave common carrier, similar to co-plaintiff Microwave, Inc., here, was denied, upon grounds of public interest, a license which would have enabled it to serve a community antenna. Such a denial of a common carrier license to Microwave, Inc., in this case would not determine the contractual property right here asserted by KLIX against the community antenna, Cable Vision, Inc., which could, as pointed out in the previous opinion of this Court, continue to operate in virtually the same way by means other than a microwave common carrier.

## THE APPLICABLE COMMON LAW

█ It has been generally held as a matter of common law under the doctrines of tortious interference with contractual rights, and under the doctrine of unfair competition as well, that one who contractually acquires, either expressly or impliedly by reference to a general industry wide custom, the exclusive right to the first call of entertainment programs, is entitled to protection of that valuable economic right, not only against the grantor, but also against acts of third persons which tortiously and unfairly prevent exploitation of the right or diminish its value. This is true without regard to and apart from any question of copyright ownership of particular program content. (See, Alcazar Amusement Co. v. Mudd & Cooley Amusement Co., 204 Ala. 509, 86 So. 209 (1920); Montgomery Enterprises v. Empire Theatre Co., 204 Ala. 566, 86 So. 880, 19 A.L.R. 987; Wells v. First National Exhibitors Circuit, 149 Ga. 200, 99 S.E. 615 (1919); Peekskill Theatres v. Advance Theatrical Co., 206 App.Div. 138, 200 N.Y.S. 726 (1923); Meyer v. Washington Times Co., 76 F.2d 988 (D.C.Cir. 1935)).

Also, as recognized by this Court in its previous opinion, the same result has been accomplished upon grounds of unfair competition in cases dealing with radio and television programs. Mutual Broadcasting System v. Muzac Corp., 177 Misc. 489, 30 N.Y.S.2d 419 (1941); Twentieth Century Sporting Club v. Transradio Press Service, 165 Misc. 71, 300 N.Y.S. 159 (1937); National Exhibition Co. v. Fass, Sup., 133 N.Y.S.2d 379 (1954) aff'd. App.Div., 136 N.Y.S.2d 358; Pittsburgh Athletic v. KQV Broadcasting Co., 24 F.Supp. 490 (W.D.Pa. 1938); Associated Press v. KVOS, 80 F.2d 575 (9th Cir. 1935); Veatch v. Wagner, 116 F.Supp. 904 (Alaska); Twentieth Century Sporting Club v. Massachusetts Charitable Mechanic Assn., Equity No. 60236, Massachusetts Superior Court, June 2, 1948, discussed in Solinger, "Unauthorized Uses of TV Broadcasts," 48 Col.L.Rev. 848 (1948); Uproar Co. v. National Broadcasting Co., 8 F.Supp. 358 (D.Mass.1934), Southwest Broadcasting Co. v. Oil Center Broadcasting, 210 S.W.2d 230 (1947); see also, Ettore v. Philco Broadcasting Co., 229 F.2d 481 (3d Cir. 1956).

█ For the foregoing reasons the Court, finding that KLIX has acquired a contractual exclusive right to the first run of network and film programs in the community of Twin Falls with which plaintiffs, Cable Vision and Microwave, Inc., are tortiously interfering and with which they are unfairly competing to the

detriment of KLIX and finding, further, that KLIX has no adequate remedy at law except through the issuance of a preliminary injunction herein, concludes and orders that such preliminary injunction should issue prohibiting plaintiffs, during the pendency of this action or until further order of the Court, from duplicating for community antenna subscribers in the community of Twin Falls, Idaho, any network or film program to which KLIX exercises a right of first run.

This memorandum decision is subject to the preparation and signing of Findings of Fact and Conclusions of Law as provided by Rule 52(a) F.R.Civ.P. 28 U.S.C. and a formal order of injunction as provided by Rule 65(c, d), F.R.Civ.P. which shall be prepared and proposed by counterclaimant, KLIX, served upon other parties and presented to the Court upon notice for approval.

### Supplemental Opinion

This memorandum supplements the memorandum of the Court in Cable Vision v. KUTV dated July 26, 1962.

The Court wishes to supplement its previous memorandum with respect to KLIX's claimed exclusive rights in so-called "delayed" broadcasts and with respect to the syndicated and feature films referred to in note 3 at page 3 of the previous memorandum.

Delayed broadcasts: It appears from the record that it is the practice for a network affiliate station, such as KLIX, which holds a right of first showing of a network program in its community at the time of origination, to arrange sometimes with the network to show the program at a later time, usually within 21 days.

When such arrangements are made the network either makes a film of the original broadcast available for use by KLIX or authorizes KLIX itself to film the original broadcast for the delayed broadcast.

▇▇▇▇ The question is whether such a delayed broadcast comes within the exclusivity arrangements permitted by the proviso to FCC Regulations, Sec. 3.568, Subsec. B, to which we referred in our previous memorandum.

Although we believe that this Court should construe such a proviso narrowly rather than broadly, we find indication in the Barrow Report that the FCC has recognized this custom of delayed broadcasts and has specifically considered whether a network should be required—in the case of a request by the station for a delayed broadcast—first to offer such broadcast to another station in the community for showing at the originating broadcast time; in other words, whether such a deviation in the exercise of the first run option of the station goes beyond the scope of the permitted exclusivity.

The FCC took the position that any such proposed requirement would have serious drawbacks: "It requires that the Commission set up affirmative standards as to the circumstances under which a station may not exercise the rights of first call. However, the fact that a network program may be carried on a delayed rather than a live basis is not per se contrary to the public interest. Indeed, the contrary argument may be made that the appropriate time for the showing of any program should be determined by each station, community by community and program by program. The proposal also has the disadvantage that it restrains the advertiser's freedom to choose between a delayed period on the network's affiliate and placement of the program on another station in the market." (Barrow Report, p. 276, Def.'s Ex. 21).

This indicates an FCC interpretation to the effect that the practice of delayed broadcasts is well within the permitted exclusivity proviso of FCC, Regs., Secs. 3.568, Subsec. B.

▇▇▇▇ Therefore, in our opinion, such delayed broadcast exclusivity arrangements between station KLIX and the networks are entitled to protection by the preliminary injunction for the same

reasons that broadcasts at the time of origination are entitled to protection.

Syndicated and feature films: It appears from the record that television stations, such as KLIX, contract with film distributors for the exclusive first showing in the community of syndicated films —i. e., the various popular series identified by title and released for showing one episode at a time—and for the first showing in the community of various feature movie films from the libraries of film suppliers.

For the purpose of convenience and economy, the practice is for the film distributor to arrange for making the film roll available to a group of stations in a given general area for use during the same approximate period. Each station entitled to use the film roll passes it on to the next local station so entitled. Thus, such films, although used at the same approximate time and place, are necessarily used on different days by the various stations entitled to show them. In the present case, the film roll would generally be sent for use first by the stations in Salt Lake City, Utah, and subsequently passed on to KLIX, Twin Falls, for its use on a different day.

With respect to both syndicated films and feature films, the distributor precludes itself, either by express agreement or by an agreement implied from the custom of the industry from granting to other exhibitors in the community the right to exhibit the film until the station has had an opportunity to enjoy its right of first showing.

Under these circumstances, if the community antenna service at Twin Falls picks up programs of syndicated or feature films as first broadcast from a Salt Lake station for exhibition to its Twin Falls subscribers, then, certainly, the right of first showing in the Twin Falls community, for which KLIX has paid, is rendered valueless or at least is substantially impaired.

Although these contracts between stations and film supply companies for the first run of films are not technically within the domain of network broadcasting

for which FCC Regulations are designed, they are similar to, and we recognize them as being no broader than, the exclusivity permitted by the proviso of FCC Regulations, Sec. 3.568, Subsection B, concerning network broadcasts.

The Court is of the opinion that such exclusive rights for the first showing of syndicated or feature films are entitled to protection under the circumstances here presented—under the doctrines of unfair competition and tortious interference with contractual relationships—for the same reasons that rights to broadcast network programs are entitled to protection.

In our memorandum of July 26, 1962, the Court speaking of the common law doctrine of tortious interference with contractual rights, said, "one who contractually acquires * .* * The exclusive right to the first call of entertainment programs is entitled to protection * * * against acts of third persons which tortiously and unfairly prevent exploitation of the right or diminish its value."

The cases cited thereafter dealt with situations in which the tortfeasor had induced in some way the promisor to breach his contract.

In this case, the community antenna service has not induced any breach of contract by the networks or the film suppliers, who are the grantors of KLIX's right of exclusivity. However, the community antenna's pick up of programs from Salt Lake stations and from other stations in the area for its competitive purposes in the Twin Falls community defeats or impairs the purpose and the value of the exclusive rights of KLIX in such programs.

It has long been established that the doctrine of tortious interference with such valuable contractual rights is not limited to third persons who in some way induce the grantor of the right to grant similar rights to them in violation of the exclusivity agreement. On the contrary, it has long been recognized that any one who so tortiously and unfairly interferes with such an economi-

cally advantageous contractual relationship as to make its performance impossible or more onerous and thus to impair or defeat the value of the right is liable to the grantee of the right. Livermore v. Crane, 26 Wash. 529, 67 P. 221, 57 L.R.A. 401 (1901); Glover v. Lee Higginson Corp., 95 F.Supp. 504 (D.Mass.1950); McNary v. Chamberlain, 34 Conn. 384, 91 Am.Dec. 732 (1867); Navarro v. Fiorita, 271 App.Div. 62, 62 N.Y.S.2d 730 (1946); Prosser, Torts 729–30 (2d Ed. 1955); 1 Harper & James, Torts 499–500; Carpenter, Interference with Contract Relations, 41 Harv. L.Rev. 728, 734–37 (1928).

We believe that the authorities cited in our previous memorandum—both those which deal with the doctrine of interference with contractual rights and those which deal with the doctrine of unfair competition—are applicable to the circumstances here presented.

This supplemental memorandum decision is subject to the preparation and signing of Findings of Fact and Conclusions of Law as provided by Rule 52(a), F.R.C.P. and a formal order of injunction as provided by Rule 65(c, d), F.R. C.P., which shall be prepared and proposed by counterclaimant, KLIX, served upon other parties and presented to the Court upon notice for approval.