# FORTNIGHTLY CORP. *v.* UNITED ARTISTS TELEVISION, INC.

No. 618.   Argued March 13, 1968.—Decided June 17, 1968.

*Robert C. Barnard* argued the cause for petitioner. With him on the briefs were *R. Michael Duncan* and *E. Stratford Smith.*

*Louis Nizer* argued the cause for respondent. With him on the brief were *Gerald Meyer, Gerald F. Phillips,* and *Lawrence S. Lesser.*

*Solicitor General Griswold* filed a memorandum for the United States, as *amicus curiae.*

*Bruce E. Lovett* filed a brief for the National Cable Television Association, Inc., as *amicus curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *Warner W. Gardner, William H. Dempsey, Jr.,* and *Douglas A. Anello* for the National Association of Broadcasters; by *Ambrose Doskow* for Broadcast Music, Inc.; by *Michael Finkelstein* for the All-Channel Television Society; by *Irwin Karp* for the Authors League of America, Inc.; by *Herman Finkelstein, Simon H. Rifkind, Jay H. Topkis,* and *Paul S. Adler* for the American Society of Composers, Authors and Publishers; by *Paul P. Selvin* and *William Berger* for the Writers Guild of America et al., and by *Leonard Zissu* and *Abraham Marcus* for the Screen Composers Association of the United States.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner, Fortnightly Corporation, owns and operates community antenna television (CATV) systems in Clarksburg and Fairmont, West Virginia.[1] There were no local television broadcasting stations in that immediate area until 1957. Now there are two, but, because of hilly terrain, most residents of the area cannot receive the broadcasts of any additional stations by ordinary rooftop antennas. Some of the residents have joined in

---

[1] For a discussion of CATV systems generally, see *United States* v. *Southwestern Cable Co., ante,* at 161–164.

erecting larger cooperative antennas in order to receive more distant stations, but a majority of the householders in both communities have solved the problem by becoming customers of the petitioner's CATV service.[2]

The petitioner's systems consist of antennas located on hills above each city, with connecting coaxial cables, strung on utility poles, to carry the signals received by the antennas to the home television sets of individual subscribers. The systems contain equipment to amplify and modulate the signals received, and to convert them to different frequencies, in order to transmit the signals efficiently while maintaining and improving their strength.[3]

During 1960, when this proceeding began, the petitioner's systems provided customers with signals of five television broadcasting stations, three located in Pittsburgh, Pennsylvania; one in Steubenville, Ohio; and one in Wheeling, West Virginia.[4] The distance between those cities and Clarksburg and Fairmont ranges from 52 to 82 miles.[5] The systems carried all the programming of each of the five stations, and a customer could choose any of the five programs he wished to view by simply turning the knob on his own television set. The petitioner neither edited the programs received nor originated any programs of its own.[6] The petitioner's customers

---

[2] In 1960, out of 11,442 occupied housing units in the Clarksburg area, about 7,900 subscribed to the petitioner's CATV service; out of 9,079 units in Fairmont, about 5,100 subscribed.

[3] The petitioner's systems utilized modulating equipment only during the period 1958–1964.

[4] Since 1960, some changes have been made in the stations carried by each of the petitioner's systems. As of May 1, 1964, the Clarksburg system was carrying the two local stations and three of the more distant stations, and the Fairmont system was carrying one local station and four of the more distant stations.

[5] Clarksburg and Fairmont are 18 miles apart.

[6] Some CATV systems, about 10%, originate some of their own programs. We do not deal with such systems in this opinion.

were charged a flat monthly rate regardless of the amount of time that their television sets were in use.[7]

The respondent, United Artists Television, Inc., holds copyrights on several motion pictures. During the period in suit, the respondent (or its predecessor) granted various licenses to each of the five television stations in question to broadcast certain of these copyrighted motion pictures. Broadcasts made under these licenses were received by the petitioner's Clarksburg and Fairmont CATV systems and carried to its customers. At no time did the petitioner (or its predecessors) obtain a license under the copyrights from the respondent or from any of the five television stations. The licenses granted by the respondent to the five stations did not authorize carriage of the broadcasts by CATV systems, and in several instances the licenses specifically prohibited such carriage.

The respondent sued the petitioner for copyright infringement in a federal court, asking damages and injunctive relief. The issue of infringement was separately tried, and the court ruled in favor of the respondent. 255 F. Supp. 177. On interlocutory appeal under 28 U. S. C. § 1292 (b), the Court of Appeals for the Second Circuit affirmed. 377 F. 2d 872. We granted certiorari, 389 U. S. 969, to consider an important question under the Copyright Act of 1909, 35 Stat. 1075, as amended, 17 U. S. C. § 1 *et seq.*

The Copyright Act does not give a copyright holder control over all uses of his copyrighted work.[8] Instead,

---

[7] The monthly rate ranged from $3.75 to $5, and customers were also charged an installation fee. Increased charges were levied for additional television sets and for commercial establishments.

[8] See, *e. g., Fawcett Publications* v. *Elliot Publishing Co.,* 46 F. Supp. 717; *Hayden* v. *Chalfant Press, Inc.,* 281 F. 2d 543, 547–548. "The fundamental [is] that 'use' is not the same thing as 'infringement,' that use short of infringement is to be encouraged . . . ." B. Kaplan, An Unhurried View of Copyright 57 (1967).

§ 1 of the Act enumerates several "rights" that are made "exclusive" to the holder of the copyright.[9]   If a person, without authorization from the copyright holder, puts a

[9] "Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work;

"(b) To translate the copyrighted work into other languages or dialects, or make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; to arrange or adapt it if it be a musical work; to complete, execute, and finish it if it be a model or design for a work of art;

"(c) To deliver, authorize the delivery of, read, or present the copyrighted work in public for profit if it be a lecture, sermon, address or similar production, or other nondramatic literary work; to make or procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, delivered, presented, produced, or reproduced; and to play or perform it in public for profit, and to exhibit, represent, produce, or reproduce it in any manner or by any method whatsoever. The damages for the infringement by broadcast of any work referred to in this subsection shall not exceed the sum of $100 where the infringing broadcaster shows that he was not aware that he was infringing and that such infringement could not have been reasonably foreseen; and

"(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever; and

"(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced . . . ."   17 U. S. C. § 1.

copyrighted work to a use within the scope of one of these "exclusive rights," he infringes the copyright. If he puts the work to a use not enumerated in § 1, he does not infringe.[10] The respondent's contention is that the petitioner's CATV systems infringed the respondent's § 1 (c) exclusive right to "perform ... in public for profit" (nondramatic literary works)[11] and its § 1 (d) exclusive right to "perform ... publicly" (dramatic works).[12] The petitioner maintains that its CATV systems did not "perform" the copyrighted works at all.[13]

At the outset it is clear that the petitioner's systems did not "perform" the respondent's copyrighted works in any conventional sense of that term,[14] or in any manner envisaged by the Congress that enacted the law in 1909.[15] But our inquiry cannot be limited to ordinary meaning and legislative history, for this is a statute that was drafted long before the development of the electronic phenomena with which we deal here.[16] In 1909 radio

[10] The Copyright Act does not contain a definition of infringement as such. Rather infringement is delineated in a negative fashion by the § 1 enumeration of rights exclusive to the copyright holder. See M. Nimmer, Copyright § 100 (1968).

[11] See n. 9, *supra*. We do not reach the petitioner's claim that the respondent's animated cartoons are not "literary works."

[12] See n. 9, *supra*.

[13] The petitioner also contends that if it did "perform" the copyrighted works, it did not do so "in public."

[14] Cf. *White-Smith Music Co.* v. *Apollo Co.*, 209 U. S. 1.

[15] The legislative history shows that the attention of Congress was directed to the situation where the dialogue of a play is transcribed by a member of the audience, and thereafter the play is produced by another party with the aid of the transcript. H. R. Rep. No. 2222, 60th Cong., 2d Sess., 4 (1909).

[16] "While statutes should not be stretched to apply to new situations not fairly within their scope, they should not be so narrowly construed as to permit their evasion because of changing habits due to new inventions and discoveries." *Jerome H. Remick & Co.* v. *American Automobile Accessories Co.*, 5 F. 2d 411.

itself was in its infancy, and television had not been invented. We must read the statutory language of 60 years ago in the light of drastic technological change.[17]

The Court of Appeals thought that the controlling question in deciding whether the petitioner's CATV systems "performed" the copyrighted works was: "[H]ow much did the [petitioner] do to bring about the viewing and hearing of a copyrighted work?" 377 F. 2d, at 877. Applying this test, the court found that the petitioner did "perform" the programs carried by its systems.[18] But

---

[17] A revision of the 1909 Act was begun in 1955 when Congress authorized a program of studies by the Copyright Office. Progress has not been rapid. The Copyright Office issued its report in 1961. Register of Copyrights, Report on the General Revision of the U. S. Copyright Law, House Judiciary Committee Print, 87th Cong., 1st Sess. (1961). Revision bills were introduced in the House in the Eighty-eighth Congress and in both the House and the Senate in the Eighty-ninth Congress. See H. R. 11947, 88th Cong., 2d Sess.; Hearings on H. R. 4347, 5680, 6831, 6835 before Subcommittee No. 3 of the House Judiciary Committee, 89th Cong., 1st Sess. (1965); Hearings on S. 1006 before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Judiciary Committee, 89th Cong., 2d Sess. (1966). H. R. 4347 was reported favorably by the House Judiciary Committee, H. R. Rep. No. 2237, 89th Cong., 2d Sess. (1966), but not enacted. In the Ninetieth Congress revision bills were again introduced in both the House (H. R. 2512) and the Senate (S. 597). The House bill was again reported favorably, H. R. Rep. No. 83, 90th Cong., 1st Sess. (1967), and this time, after amendment, passed by the full House. 113 Cong. Rec. 9021. The bill as reported contained a provision dealing with CATV, but the provision was struck from the bill on the House floor prior to enactment. See n. 33, *infra*. The House and Senate bills are currently pending before the Senate Subcommittee on Patents, Trademarks, and Copyrights.

[18] The court formulated and applied this test in the light of this Court's decision in *Buck* v. *Jewell-LaSalle Realty Co.*, 283 U. S. 191. See also *Society of European Stage Authors & Composers* v. *New York Hotel Statler Co.*, 19 F. Supp. 1. But in *Jewell-LaSalle*, a hotel received on a master radio set an unauthorized broadcast of a copyrighted work and transmitted that broadcast

mere quantitative contribution cannot be the proper test to determine copyright liability in the context of television broadcasting. If it were, many people who make large contributions to television viewing might find themselves liable for copyright infringement—not only the apartment house owner who erects a common antenna for his tenants, but the shopkeeper who sells or rents television sets, and, indeed, every television set manufacturer. Rather, resolution of the issue before us depends upon a determination of the function that CATV plays in the total process of television broadcasting and reception.

Television viewing results from combined activity by broadcasters and viewers. Both play active and indispensable roles in the process; neither is wholly passive. The broadcaster selects and procures the program to be viewed. He may produce it himself, whether "live" or with film or tape, or he may obtain it from a network or some other source. He then converts the visible images and audible sounds of the program into electronic signals,[19] and broadcasts the signals at radio frequency for public reception.[20] Members of the public, by means of television sets and antennas that they themselves provide, receive the broadcaster's signals and reconvert

to all the public and private rooms of the hotel by means of speakers installed by the hotel in each room. The Court held the hotel liable for infringement but noted that the result might have differed if, as in this case, the original broadcast had been authorized by the copyright holder. 283 U. S., at 199, n. 5. The *Jewell-LaSalle* decision must be understood as limited to its own facts. See n. 30, *infra*.

[19] If the broadcaster obtains his program from a network, he receives the electronic signals directly by means of telephone lines or microwave.

[20] Broadcasting is defined under the Communications Act of 1934 as "the dissemination of radio communications intended to be received by the public . . . ." 47 U. S. C. § 153 (*o*).

them into the visible images and audible sounds of the program. The effective range of the broadcast is determined by the combined contribution of the equipment employed by the broadcaster and that supplied by the viewer.[21]

The television broadcaster in one sense does less than the exhibitor of a motion picture or stage play; he supplies his audience not with visible images but only with electronic signals. The viewer conversely does more than a member of a theater audience; he provides the equipment to convert electronic signals into audible sound and visible images. Despite these deviations from the conventional situation contemplated by the framers of the Copyright Act,[22] broadcasters have been judicially treated as exhibitors, and viewers as members of a theater audience. Broadcasters perform.[23] Viewers do not perform.[24] Thus, while both broadcaster and viewer play crucial roles in the total television process, a line is drawn

---

[21] See Hearings on H. R. 4347, 5680, 6831, 6835 before Subcommittee No. 3 of the House Judiciary Committee, 89th Cong., 1st Sess., at 1312–1318 (1965).

[22] See n. 15, *supra.*

[23] *Jerome H. Remick & Co.* v. *American Automobile Accessories Co.*, 5 F. 2d 411 (radio broadcast); *Associated Music Publishers* v. *Debs Memorial Radio Fund*, 141 F. 2d 852 (radio broadcast of recorded program); *Select Theatres Corp.* v. *Ronzoni Macaroni Co.*, 59 U. S. P. Q. 288 (D. C. S. D. N. Y.) (radio broadcast of program received from network). Congress in effect validated these decisions in 1952 when it added to § 1 (c) a special damages provision for "infringement by broadcast." 66 Stat. 752.

[24] "One who manually or by human agency merely actuates electrical instrumentalities, whereby inaudible elements that are omnipresent in the air are made audible to persons who are within hearing, does not 'perform' within the meaning of the Copyright Law." *Buck* v. *Debaum*, 40 F. 2d 734, 735.

"[T]hose who listen do not perform . . . ." *Jerome H. Remick & Co.* v. *General Electric Co.*, 16 F. 2d 829.

between them. One is treated as active performer; the other, as passive beneficiary.

When CATV is considered in this framework, we conclude that it falls on the viewer's side of the line.[25] Essentially, a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals; it provides a well-located antenna with an efficient connection to the viewer's television set.[26] It is true that a CATV system plays an "active" role in making reception possible in a given area, but so do ordinary television sets and antennas. CATV equipment is powerful and sophisticated, but the basic function the equipment serves is little different from that served by the equipment generally furnished by a television viewer.[27]

---

[25] While we speak in this opinion generally of CATV, we necessarily do so with reference to the facts of this case.

[26] Cf. *Lilly* v. *United States,* 238 F. 2d 584, 587:

"[T]his community antenna service was a mere adjunct of the television receiving sets with which it was connected . . . ."

[27] The District Court's decision was based in large part upon its analysis of the technical aspects of the petitioner's systems. The systems have contained at one time or another sophisticated equipment to amplify, modulate, and convert to different frequencies the signals received—operations which all require the introduction of local energy into the system. The court concluded that the signal delivered to subscribers was not the same signal as that initially received off the air. 255 F. Supp., at 190–195. The Court of Appeals refused to attach significance to the particular technology of the petitioner's systems, 377 F. 2d, at 879, and we agree. The electronic operations performed by the petitioner's systems are those necessary to transmit the received signal the length of the cable efficiently and deliver a signal of adequate strength. Most of the same operations are performed by individual television sets and antennas. See Hearings on H. R. 4347 before Subcommittee No. 3 of the House Judiciary Committee, *supra,* at 1312–1318. Whether or not the signals received and delivered are the "same," the entire process is virtually instantaneous, and electronic "information" received and delivered is identical. 255 F. Supp., at 192.

If an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be "performing" the programs he received on his television set. The result would be no different if several people combined to erect a cooperative antenna for the same purpose. The only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur.

The function of CATV systems has little in common with the function of broadcasters.[28] CATV systems do not in fact broadcast or rebroadcast.[29] Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive. Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released to the public and carry them by private channels to additional viewers. We hold that CATV

---

[28] Cf. *Intermountain Broadcasting & Television Corp.* v. *Idaho Microwave, Inc.*, 196 F. Supp. 315, 325:

"[Broadcasters] and [CATV systems] are not engaged in the same kind of business. They operate in different ways for different purposes.

"[Broadcasters] are in the business of selling their broadcasting time and facilities to the sponsors to whom they look for their profits. They do not and cannot charge the public for their broadcasts which are beamed directly, indiscriminately and without charge through the air to any and all reception sets of the public as may be equipped to receive them.

"[CATV systems], on the other hand, have nothing to do with sponsors, program content or arrangement. They sell community antenna service to a segment of the public for which [broadcasters'] programs were intended but which is not able, because of location or topographical condition, to receive them without rebroadcast or other relay service by community antennae. . . ."

[29] *Cable Vision, Inc.* v. *KUTV, Inc.*, 211 F. Supp. 47, vacated on other grounds, 335 F. 2d 348; *Report and Order on CATV and TV Repeater Services*, 26 F. C. C. 403, 429–430.

operators, like viewers and unlike broadcasters, do not perform the programs that they receive and carry.[30]

We have been invited by the Solicitor General in an *amicus curiae* brief to render a compromise decision in this case that would, it is said, accommodate various competing considerations of copyright, communications, and antitrust policy.[31]   We decline the invitation.[32]   That job is for Congress.[33]   We take the Copyright Act of 1909

---

[30] It is said in dissent that, "Our major object . . . should be to do as little damage as possible to traditional copyright principles and to business relationships, until the Congress legislates . . . ." *Post,* at 404.   But existing "business relationships" would hardly be preserved by extending a questionable 35-year-old decision that in actual practice has not been applied outside its own factual context, *post,* at 405, n. 3, so as retroactively to impose copyright liability where it has never been acknowledged to exist before.   See n. 18, *supra.*

[31] Compare, *e. g.,* Note, CATV and Copyright Liability, 80 Harv. L. Rev. 1514 (1967); Note, CATV and Copyright Liability: On a Clear Day You Can See Forever, 52 Va. L. Rev. 1505 (1966); B. Kaplan, An Unhurried View of Copyright 104–106 (1967); Statement of then Acting Assistant Attorney General (Antitrust Division) Zimmerman, Hearings on S. 1006 before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Judiciary Committee, 89th Cong., 2d Sess., at 211–219 (1966).

[32] The Solicitor General would have us hold that CATV systems do perform the programs they carry, but he would have us "imply" a license for the CATV "performances." This "implied in law" license would not cover all CATV activity but only those instances in which a CATV system operates within the "Grade B Contour" of the broadcasting station whose signal it carries.   The Grade B contour is a theoretical FCC concept defined as the outer line along which reception of acceptable quality can be expected at least 90% of the time at the best 50% of locations.   Sixth Report and Order, 17 Fed. Reg. 3905, 3915.   Since we hold that the petitioner's systems did not perform copyrighted works, we do not reach the question of implied license.

[33] The copyright revision bill recently passed by the House, see n. 17, *supra,* originally contained a detailed and somewhat complex provision covering CATV.   H. R. 2512, 90th Cong., 1st Sess., § 111.

as we find it. With due regard to changing technology, we hold that the petitioner did not under that law "perform" the respondent's copyrighted works.

The judgment of the Court of Appeals is *Reversed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN took no part in the decision of this case.

MR. JUSTICE FORTAS, dissenting.

This case calls not for the judgment of Solomon but for the dexterity of Houdini. We are here asked to consider whether and how a technical, complex, and specific Act of Congress, the Copyright Act, which was enacted in 1909, applies to one of the recent products of scientific

Congressman Poff described the bill in terms of its effect on the District Court's decision in the present case:

"By, in effect, repealing the court decision which would impose full copyright liability on all CATV's in all situations, the committee recommends H. R. 2512, which would exempt them in some situations, make them fully liable in some, and provide limited liability in others." 113 Cong. Rec. 8588.

See H. R. Rep. No. 83, 90th Cong., 1st Sess., 6–7, 48–59 (1967). On the House floor the CATV provision was deleted in order to refer the matter to the Interstate and Foreign Commerce Committee, which has jurisdiction over communications. 113 Cong. 8598–8601, 8611–8613, 8618–8622, 8990–8992. In urging deletion of the CATV provision, Congressman Moore said:

"[W]hat we seek to do in this legislation is control CATV by copyright. I say that is wrong. I feel if there is to be supervision of this fast-growing area of news media and communications media, it should legitimately come to this body from the legislative committee that has direct jurisdiction over the same.

". . . This bill and the devices used to effect communications policy are not proper functions of copyright . . . ." 113 Cong. Rec. 8599.

and promotional genius, CATV. The operations of CATV systems are based upon the use of other people's property. The issue here is whether, for this use, the owner of copyrighted material should be compensated. From a technical standpoint the question—or at least one important question—is whether the use constitutes a "performance" of the copyrighted material within the meaning of § 1 (c) of the Copyright Act, 17 U. S. C. § 1 (c). But it is an understatement to say that the Copyright Act, including the concept of a "performance," was not created with the development of CATV in mind. The novelty of the use, incident to the novelty of the new technology, results in a baffling problem. Applying the normal jurisprudential tools—the words of the Act, legislative history, and precedent—to the facts of the case is like trying to repair a television set with a mallet. And no aid may be derived from the recent attempts of Congress to formulate special copyright rules for CATV—for Congress has vacillated in its approach.[1]

At the same time, the implications of any decision we may reach as to the copyright liability of CATV are very great. On the one hand, it is darkly predicted that the imposition of full liability upon all CATV operations could result in the demise of this new, important instrument of mass communications; or in its becoming a tool of the powerful networks which hold a substantial number of copyrights on materials used in the television industry. On the other hand, it is foreseen that a decision to the effect that CATV systems never infringe the copyrights of the programs they carry would permit such systems to overpower local broadcasting stations

[1] See B. Kaplan, An Unhurried View of Copyright 105–106, 127–128 (1967).

which must pay, directly or indirectly, for copyright licenses and with which CATV is in increasing competition.[2]

The vastness of the competing considerations, the complexity of any conceivable equitable solution to the problems posed, and the obvious desirability of ultimately leaving the solution to Congress induced the Solicitor General, in a memorandum filed prior to oral argument in this case, to recommend "that the Court should stay its hand because, in our view, the matter is not susceptible of definitive resolution in judicial proceedings and plenary consideration here is likely to delay and prejudice the ultimate legislative solution."

That is a splendid thought, but unhappily it will not do. I agree with the majority that we must pass on the instant case. An important legal issue is involved. Important economic values are at stake, and it would be hazardous to assume that Congress will act promptly, comprehensively, and retroactively. But the fact that the Copyright Act was written in a different day, for different factual situations, should lead us to tread cautiously here. Our major object, I suggest, should be to do as little damage as possible to traditional copyright principles and to business relationships, until the Congress legislates and relieves the embarrassment which we and the interested parties face.

The opinion of the majority, in my judgment, does not heed this admonition. In an attempt to foster the development of CATV, the Court today abandons the

---

[2] The Solicitor General, in his brief on the merits, recommends that we adopt a compromise approach—finding a license implied in law with respect to some CATV operations, but not with respect to others. Regardless of the advisability of such an approach from the standpoint of communications, antitrust, and other relevant policies, I do not believe it is open to us, in construing the Copyright Act, to accept the Solicitor General's proposal.

teachings of precedent, including a precedent of this Court (see *Buck* v. *Jewell-LaSalle Realty Corp.,* 283 U. S. 191 (1931); *Society of European Stage Authors and Composers* v. *New York Hotel Statler Co.,* 19 F. Supp. 1 (1937)), as to the meaning of the term "perform" in the Copyright Act. It is not our general practice to reverse ourselves, without compelling reasons to do so, on matters of statutory construction, especially on a construction of many years' standing under which an entire industry has operated.[3] Yet today's decision might not be objectionable, if the majority replaced what it considers an outmoded interpretation of the term "perform" with a new, equally clear, and workable interpretation. It does not, however, do this. It removes from copyright law an interpretation which, though perhaps not altogether satisfactory as an analytical matter,[4] has at least been settled for nearly 40 years; and it substitutes for that discarded interpretation a rule which I do not believe is an intelligible guide for the construction of the Copyright Act. Moreover, the new rule may well have disruptive consequences outside the area of CATV.

The approach manifested in the opinion of the Court is disarmingly simple. The Court merely identifies two groups in the general field of television, one of which it believes may clearly be liable, and the other clearly not liable, for copyright infringement on a "performance"

---

[3] Nimmer, a leading authority in the copyright field, states that although "the two major performing right societies, ASCAP and BMI, do not choose to enforce the Jewell-LaSalle doctrine to its logical extreme in that they do not demand performing licenses from commercial establishments such as bars and restaurants which operate radio or television sets for the amusement of their customers, . . . such demands are made of hotels which operate in the manner of the LaSalle Hotel." M. Nimmer, Copyright § 107.41, n. 204 (1968).

[4] See M. Nimmer, Copyright § 107.41 (1968).

theory: "Broadcasters perform. Viewers do not perform." From this premise, the Court goes on to hold that CATV "falls on the viewer's side of the line. Essentially, a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals; it provides a well-located antenna with an efficient connection to the viewer's set. . . . CATV equipment is powerful and sophisticated, but the basic function the equipment serves is little different from that served by the equipment generally furnished by a television viewer." *Ante,* at 398–399.

The decision in *Buck* v. *Jewell-LaSalle,* must, the Court says today, "be understood as limited to its own facts." *Ante,* at 397, n. 18. In *Buck,* the Court, speaking unanimously through Mr. Justice Brandeis, held that a hotel which received a broadcast on a master radio set and piped the broadcast to all public and private rooms of the hotel had "performed" the material that had been broadcast. As I understand the case, the holding was that the use of mechanical equipment to extend a broadcast to a significantly wider public than the broadcast would otherwise enjoy constitutes a "performance" of the material originally broadcast. I believe this decision stands squarely in the path of the route which the majority today traverses. If a CATV system performs a function "little different from that served by the equipment generally furnished by a television viewer," and if that is to be the test, then it seems to me that a master radio set attached by wire to numerous other sets in various rooms of a hotel cannot be distinguished.[5]

---

[5] The majority attempts to diminish the compelling authority of *Buck* v. *Jewell-LaSalle,* by referring to a vague footnote in that opinion to the effect that the Court might not have found a "performance" if the original broadcast, which was picked up by the hotel and brought to its various rooms, had been authorized by the

The vague "functional" test of the meaning of the term "perform" is, moreover, unsatisfactory. Just as a CATV system performs (on the majority's analysis) the same function as the antenna of the individual viewer, so a television camera recording a live drama performs the same function as the eye of a spectator who is present in the theater. Both the CATV and the television camera "receive programs that have been released to the public and carry them by private channels to additional viewers." *Ante,* at 400. Moreover, the Court has indulged in an oversimplification of the "function" of CATV. It may be, indeed, that insofar as CATV operations are limited to the geographical area which the licensed broadcaster (whose signals the CATV has picked up and carried) has the power to cover, a CATV is little more than a "cooperative antenna" employed in order to ameliorate the image on television screens at home or to bring the image to homes which, because of obstacles other than mere distance, could not receive them. But such a description will not suffice for the case in which a CATV has picked up the signals of a licensed broadcaster and carried them beyond the area—however that area be defined—which the broadcaster normally serves. In such a case the CATV *is* performing a function different from a simple antenna for, by hypothesis, the antenna could not pick up the signals of the licensed broadcaster and enable CATV patrons to receive them in their homes.

*Buck* v. *Jewell-LaSalle* may not be an altogether ideal gloss on the word "perform," but it has at least the merit of being settled law. I would not overrule that decision

---

copyright holder—as it was not. I cannot understand the point. Whatever might be the case in a contributory infringement action (which this is not), the interpretation of the term "perform" cannot logically turn on the question whether the material that is used is licensed or not licensed.

in order to take care of this case or the needs of CATV. This Court may be wrong. The task of caring for CATV is one for the Congress. Our ax, being a rule of law, must cut straight, sharp, and deep; and perhaps this is a situation that calls for the compromise of theory and for the architectural improvisation which only legislation can accomplish.

I see no alternative to following *Buck* and to holding that a CATV system does "perform" the material it picks up and carries. I would, accordingly, affirm the decision below.