PADUCAH NEWSPAPERS, INC. (Television Station WPSD–TV), Petitioner,

v.

FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents,

Egyptian Cablevision, Inc. and Southern Video Corporation, Benton Television Company, Intervenors.

HIRSCH BROADCASTING COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents,

Benton Television Company, Egyptian Cablevision, Inc. and Southern Video Corporation, Intervenors.

TURNER–FARRAR ASSOCIATION, etc., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents,

Egyptian Cablevision, Inc. and Southern Video Corporation, Intervenors.

Nos. 22007, 22019, 22027.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 16, 1968.

Decided June 30, 1969.

Petition for Rehearing Denied Aug. 14, 1969.

Mr. Arthur Stambler, Washington, D. C., with whom Messrs. George O. Sutton and Thomas N. Frohock, Washington, D. C., were on the brief, for petitioners. Mr. James A. McKenna, Washington, D. C., also entered an appearance for petitioners in No. 22,027.

Mr. D. Biard MacGuineas, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, Federal Communications Commission, and Howard E. Shapiro, Atty., Department of Justice, were on the brief, for respondents. Mrs. Lenore G. Ehrig and William L. Fishman, Counsel, Federal Communications Commission, also entered appearances for respondents.

Mr. William P. Bernton, Washington, D. C., for intervenors, Egyptian Cable-

vision, Inc. and Southern Video Corporation. Mr. John J. Baker, Washington, D. C., also entered an appearance for intervenors, Egyptian Cablevision, Inc. and Southern Video Corporation.

Mr. Donald P. Zeifang, with whom Mr. John D. Matthews, Washington, D. C., was on the brief, for intervenor, Benton Television Co.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

McGOWAN, Circuit Judge:

This case is the latest in a series in this court that have challenged the Federal Communications Commission's failure to hold hearings under 47 C.F.R. § 74.1107 (1968).[1] All of these cases have turned upon the interpretation the Commission and this court have given to the rules promulgated by the Commission in its so-called Second Report and Order, 2 F.C.C.2d 725 (1966), in which it established its jurisdiction over and sought to regulate the further expansion of CATV.[2] In these cases this court has affirmed the Commission's actions in deference to the Commission's expertise in the formulation of communications policy, without an unduly rigorous scrutiny of the application of basic principles of proper administration by the Commission.

On a number of occasions, however, we have issued warnings to the Commission that, although in the particular case an affirmance was in order, further specificity in the proof and clearer articulation of the considerations which underlay the Commission's findings would be required in the future.[3] Our task, then, in assessing the propriety of the Commission's waivers in this case, should be to see whether the warnings issued in our earlier opinions have been heeded sufficiently to satisfy the essential axiom that administrative actions be rationally explicable, consistent, and in accordance with existing policy as stated in statutory or regulatory guidelines.

I

At issue here are three consolidated petitions to review a Memorandum Opinion and Order of the Commission granting waivers of the hearing requirement of 47 C.F.R. § 74.1107 (1968), and authorizations to begin operations to seven CATV systems in the Paducah, Kentucky-Cape Girardeau, Missouri-Harrisburg, Illinois [hereinafter designated the "Paducah"] market.[4] Petitioners, the licensees of the three network-affiliated VHF stations in the Paducah market, are located in the three principal[5] cities of

1. Pikes Peak Broadcasting Co. v. FCC, Nos. 22023–24 (March 24, 1969), cert. denied, 395 U.S. 979, 89 S.Ct. 2134, 23 L. Ed.2d 767 (June 23, 1969); Indiana Broadcasting Corp. v. FCC, 407 F.2d 681 (December 5, 1968); Cedar Rapids Television Co. (KCRG-TV) v. FCC, 128 U.S.App.D.C. 270, 387 F.2d 228 (1967); Hubbard Broadcasting, Inc. v. FCC, 128 U.S.App.D.C. 197, 385 F.2d 979 (1967); Channel 9 Syracuse, Inc. v. FCC, 128 U.S.App.D.C. 187, 385 F.2d 969 (1967). See also United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967).

2. See also First Report and Order, 38 F.C.C. 683 (1965). Just before this court heard oral argument in this case the Commission issued Notice of Proposed Rule Making and Notice of Enquiry, 33 Fed. Reg. 19028 (1968), the effect of which will be discussed hereinafter.

3. E. g., Channel 9 Syracuse, Inc. v. FCC, 128 U.S.App.D.C. 187, 193, 385 F.2d 969, 975 (1967).

4. The construction of the CATV systems has, however, been stayed pending the outcome of this proceeding.

5. Although the parties seem willing to characterize Harrisburg as a principal city in the market, it should be pointed out that its population is only 9,171, while other cities in the market, including two where CATV applicants are located (Marion, Illinois–11,274; Carbondale, Illinois–14,670) have greater populations. This may assume practical importance when one considers that many of the differences

the market. Other television services already extant in the market include one educational VHF station in Carbondale, Illinois, and only one other CATV system, located in Mayfield, Kentucky (population 10,762). In addition, one UHF station, which significantly is not a petitioner here, has been authorized to begin operations in Paducah and presumably is proceeding apace to commence broadcasting; and another UHF channel has been allocated to Cape Girardeau, although no applicants for that franchise have yet come forward. The applicants for the CATV systems [intervenors in this case] are Benton Television Co., which plans to construct a system in Benton, Kentucky, and Egyptian Cablevision, Inc., and Southern Video Corp., which plan to construct systems in the towns of Marion, West Frankfort, Carbondale, Johnston City, Murphysboro, and Carterville, all in Illinois [hereinafter designated the Illinois towns].[6] The Commission, assertedly acting pursuant to the authority of 47 C.F.R. § 74.1109 (1968), granted these applicants for CATV systems waivers of the evidentiary hearing requirement of 47 C.F.R. § 74.1107 (1968), which ordinarily would have been applicable since the applications were made by systems which were to be operated in a major or top-100 market and which proposed to extend distant television signals beyond their Grade B contour.[7]

Were this court to take a strict view of the Commission's performance of its function in administering the Communications Act, the Commission on this record arguably could not be affirmed. We are compelled to recognize, however, that the Commission seems to be making serious efforts to keep up with a technology producing advances so fast that innovations, unthought of yesterday, are rendered obsolete today, and bid fair to be trivial in comparison to what will be developed tomorrow.[8] Simultaneously, the Commission has been seeking the aid of Congress in the formulation of policy with respect to the interrelationship of CATV and the other aspects of the broadcasting industry. Congress, however, has been silent and the Commission, through circumstance and not by choice, has thus far been called upon to shoulder an increasingly difficult burden alone.

between the parties relate to the "uniqueness" of the market in its characteristic that it has no significant metropolitan base or hub. Paducah, with a population of 34,479, is the largest city in the market, which, although it consists of primarily smaller towns and rural countryside, is ranked among the top 100 markets in the country. The parties differ as to whether it is ranked 80th or 87th.

6. The Illinois towns proposed to import distant signals from the three network stations and one independent in St. Louis, Missouri, and from three network affiliates in Evansville, Indiana. The Benton CATV proposed to carry the signals of four stations in Nashville, Tennessee, including one independent, and one Evansville, Indiana station, an ABC affiliate.

7. 12 F.C.C.2d 546 (1968). The Commission did, however, split 4–1 in approving the Benton system and 3–2 in approving the others, with two commissioners not participating.

8. Not long ago, CATV was a service seemingly useful only in the back-country small towns where TV service otherwise would have been spotty or non-existent. Today it not only is breaking into even the largest markets, but it also holds promise of providing additional original programming of both a commercial and non-commercial nature. In its Second Report and Order issued three years ago, the Commission was most concerned with the potential adverse impact which CATV might prove to have on the development of local UHF independent stations, particularly in the top-100 markets. In its more recent *Proposed Rule*, however, shifting its focus, it seemed more concerned with the "unfair competition" which CATV programming might provide in relation to local stations and accordingly will rely on "market forces," brought into play through the requirement of "retransmission consent," to achieve its objective of remedying the unfair aspects of the competition. In addition, recognizing the potential which CATV has for program origination, the Commission proposed to approve or even to demand continued development in that area.

These considerations provide justification for this court's employing a more flexible standard of judicial review than it might ordinarily be called upon to use in assessing Commission actions in that transition period when new information is constantly emerging, when the comparative relationship between CATV and the rest of the industry is in a state of flux, and, as a result, when the Commission is constantly being called upon to change its policies in response to changing conditions.

Seen in this light, the Second Report and Order, with all its flaws and imponderables, was a commendable effort. That the Commission was not then prepared to announce definitive standards determining the extent of CATV activity to be permitted in the top-100 markets may be unfortunate, but it is hard to see, given the state of the art at the time, what it could have done other than what it did do, namely, to say that it would hold hearings which would gather further specific information useful to determine what the impact of CATV would be in those markets where applications were filed.[9]  On the other hand, it also seems reasonable in retrospect, that the Commission chose to provide a waiver route, in order to avoid what would inevitably be a prolonged hearing procedure in those situations where it could assess impact without a hearing and where it deemed the applications in the public interest.

In this case, see also, e.g., Channel 9 Syracuse, Inc. v. FCC, 128 U.S.App.D. C. 187, 385 F.2d 969 (1967); cf. Pikes

Peak Broadcasting Co. v. FCC, Nos. 22,-023–24 (March 24, 1969), cert. denied 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (June 23, 1969), the Commission has not seen fit to explicate in detail why it has opted for the granting of waivers. But this fault is not so serious as to warrant a reversal and remand here [10] where the court, after prolonged investigation, has within the confines of its limited expertise determined that the CATVs, under the Commission's own standards, do indeed appear to be in the public interest.

## II

The Second Report and Order was divided into two parts. In Part I, the Commission extended its jurisdiction over CATV systems to include nonmicrowave systems as well as the microwave systems over which it had asserted jurisdiction in the First Report and Order. It also made applicable to nonmicrowave systems, with the exception of certain modifications also adopted in the Second Report, carriage and nonduplication provisions identical to those which had theretofore been applied to microwave systems.  It was thought that these provisions, which guaranteed to network-affiliated stations that their programs would be carried by CATVs located within their grade B contours and which afforded them protection against the CATVs' duplicating programs within one day of the time when the stations had transmitted them over the air, would be sufficient to protect them from unwar-

---

9. In this regard, it should be pointed out that the Commission eventually did hold one major hearing, during which evidence was presented which drastically changed the Commission's views on CATV and which led, in due course, to its Notice of Proposed Rule-Making and Notice of Enquiry, 33 Fed.Reg. 19028 (1968), see note 2 *supra*. Midwest Television, Inc., 13 F.C.C.2d 478 (1968). The length of time which the *Midwest* proceeding took, however, shows that the determination of the Commission whether or not to set a case down for hearing was infinitely more crucial to the future of a CATV than its

prospects for success if a hearing actually was called for by the Commission.

10. The new *Proposed Rule* has "grandfathered" all CATVs authorized prior to the publication of the *Proposed Rule* in the Federal Register. Since we have affirmed the Commission, we need express no opinion on the question whether a remand would have vacated the authorization or whether it would merely have required the Commission to hold a hearing to see whether the authorization was correctly granted.

ranted or unfair competition from CATV. So long as all CATV systems were to be required to broadcast network programs sent out by local network-affiliates, the Commission felt that these stations had enough of an economic guarantee of stability that the added competition which the broadcasting of distant nonnetwork and nonduplicative programs would bring would not seriously affect the viability of these enterprises.[11]

In Part II of the Second Report, however, the Commission's concern shifted from the protection of existing, economically viable network-affiliated facilities to more complex considerations involved in assessing the comparative merits of CATV and UHF development. The Commission recognized that in many markets and competitive situations these two types of television service could not co-exist, and that permitting development of CATV in certain situations would effectively bar, or at least seriously curtail, the development of a nationwide grid—perhaps even "network"— of local, independent UHF facilities. In its analysis, it identified two major ways in which CATV seemed to pose a threat to UHF development.

First, it noted that since CATV would import from major cities in the vicinity of the city or town where it was set up the local programming of both the network-affiliates and the independent stations in those major cities, it would preempt much of the demand for nonnetwork programming which otherwise would have been available for UHF exploitation in that city or town. As a

consequence, it seemed that CATV development would discourage the construction of new UHF facilities in cities and towns within the range of large city independents and network stations which could afford expensive and desirable nonnetwork programming. This phenomenon the Commission labelled the "economic impact" ground on which it based its decision on how to handle new CATV applications.

The second way in which CATV threatened UHF development was denominated by the Commission the "fair competition" ground for its decision. The Commission found this concept harder to define than the simple "economic impact" question of whether a UHF could survive when faced by competition from large city nonnetwork programming. It also recognized that "fair competition" might include within its scope the relationship of CATV to all independent stations and even to the nonnetwork programming of network affiliates. The essential idea of "fair competition," however, may be seen as encompassing all those considerations raised by the fact that broadcast stations must pay for the programs which they put on the air, whereas CATV has thus far been able to transmit programs without any cost other than the construction and operation of the transmitters and the CATV cables.[12] The nonduplication requirements of Part I of the *Second Report* have served well to except almost all network, much sports, and certain other sorts of programming which loses its appeal if not shown at a particular time,

---

11. One of the contentions which this court rejected in Pikes Peak Broadcasting Co. v. FCC, *see* note 1, *supra*, was that the Commission was wrong in assuming that, because of the carriage and nonduplication provisions, CATV could not be disastrous for the local network-affiliated stations in a smaller market. In this case, although the network-affiliates are the only petitioners, they do not challenge the CATV systems on the theory that their own viability would be threatened if CATV were allowed to enter their market; rather, they seek to represent the interests of nascent UHF facilities which

may subsequently enter the market if CATV development is curtailed, but whose birth would otherwise be aborted if CATV breaks through.

12. The Supreme Court in Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), has held that CATVs are to be termed "viewers," not "performers," and are therefore not subject to copyright liability in the absence of Congressional amendment of the Communications or Copyright Acts.

from the "unfair" competition of CATV. But other sorts of programs, such as feature movies, which are no longer current and can be shown at any time, are free off the air to CATV, but may be expensive for a local station to carry. A secondary area of conflict which is encompassed within the "fair competition" rubric may occur at the fringes of a geographic area which is "blacked out" because the local athletic team is playing a home game. The stations in surrounding communities are prohibited from carrying the game, but a CATV located within the blacked out area may be able to pick up the game from a community outside that area and thus not only acquire a competitive advantage over the local stations, but also frustrate the purposes of the blackout.

The Commission admitted that it had been unable to reach a decision as to exactly how these grounds for concern should be weighed in evaluating CATV impact upon UHF. It saw some of the negative effects which CATV could have, but it also recognized in CATV a potential for expanding service in quantity and quality to great numbers of people who, without its advent, might be forced to wait years for, if not be forced to forego forever, an equivalent improvement in reception and program choice from UHF development. Thus, it concluded that the wisest course to follow would be to create presumptions, in favor of CATV in the smaller markets and against CATV in the larger markets.[13] Drawing the dividing line at the 100th largest market, the Commission drew up Regulations which stated that, in order for further CATV development to take place in a top-100 market, an evidentiary hearing would be required, whereas in a market not in the top-100 the only requirement placed upon prospective CATV operators was a notice provision, after which they were generally free to proceed without further interference. The stated purpose of the hear-

ing requirement in top-100 cases was the desire to amass more specific information pertinent to the relevant market before allowing further CATV penetration therein. The corresponding purpose in eschewing a hearing in the smaller markets was to let CATV develop rapidly where, in accord with the evidence already at hand, its value seemed clear and its impact on UHF negligible.

Having made this sharp distinction between the 100th and 101st markets, however, the Commission then backtracked. Realizing that in some top-100 markets, hearings would not be helpful and that in some below top-100 markets, hearings perhaps might be useful, the Commission added another provision, 47 C.F.R. § 74.1109 (1968), which permitted it discretion to waive the rules just summarized in appropriate cases. The issue in this case, then, is whether the Commission acted appropriately in waiving a hearing and in granting the petitions for waiver under § 74.1109 filed by the prospective CATVs in this market.

### III

Before turning to an investigation of the propriety of the Commission's waiver, it may be helpful to outline the changes in its policies which the Commission proposed in its Notice of Proposed Rule-Making and Notice of Enquiry, 33 Fed.Reg. 19028, released December 13, 1968. The evidence which the Commission accumulated in the period of time, over two and a half years, since the issuance of the Second Report and Order, particularly through its extensive hearing and experimentation in the San Diego, California, market, Midwest Television Inc., 13 F.C.C.2d 478 (1968), apparently convinced it that CATV indeed might provide useful service in the top-100 markets. The service which the Commission focused upon in its *Proposed Rule*, however was a new type of service, with primary emphasis on program origination. The fast expanding

---

13. The theory behind this distinction was, of course, that, even without the intrusion of CATV, UHF stations were less likely to be economically viable and thus were less likely to come into being in small markets.

technology of CATV, in other words, has opened up new horizons for local programming never before even contemplated in the context of limited-channel television.[14]

On the other hand, the Commission determined that evidence adduced in the *Midwest* hearing had shown that CATV penetration into a major market might indeed be substantial, on the order of fifty per cent of the television homes in a market, and that "unfair competition," which received only a moderate amount of attention in its *Second Report and Order,* would accordingly become an even greater factor in the interrelationship between CATV and UHF. Thus, in a reversal of prior policy, the Commission determined to propose that henceforth CATVs in the top-100 markets should be permitted to retransmit distant signals only if they had received retransmission consent from the stations whose signals they proposed to carry.[15]

To this end, the Commission proposed to adopt an entirely new set of procedures, easier to apply than the old rules and not to be waived even in the most extreme situation. The new procedures, were they applicable to the facts at bar, would, in the absence of retransmission consent, effectively bar from the air all the CATVs which have been granted waivers by the Commission in this proceeding. This is so because all the CATVs fall within a 35-mile zone extending around the main post office of a community to which a top-100 market station is assigned, and because all the CATVs propose to carry beyond their normal grade B contours the signals of distant

commercial stations. The saving point for the CATVs here, however, is that the new proposed rule and procedures are not applicable to CATV. systems operating or authorized prior to December 20, 1968; thus, the CATVs in this case have been "grandfathered,"[16] at least so long as this court does not reverse the Commission's authorization. Petitioners do not directly attack the grandfathering provision; instead, they rely heavily on the implications which the changes in policy embodied in the *Proposed Rule* have upon the bases for the Commission's decision in this case.

## IV

The petitions for waiver before the Commission filed by Benton Television Co., and Egyptian Cablevision, Inc., and Southern Video Corp. were decided in conjunction with a petition filed by another prospective CATV system in the same market, Multi-Channel Cable Co. of Paducah, Kentucky. In general findings, applicable to all the petitions, the Commission first observed that the Paducah market contained "an unusually large rural population—generally not available to CATV—spread over a large three-state area and comprised of three cities with no common connecting metropolitan area." In this situation, it held that CATV could provide "a useful supplemental service," while "at the same time keep[ing] intact a large economic base for existing and potential television broadcast stations in the market."

With this as background, the Commission then differentiated the proposals before it. As to the Paducah proposal,

---

14. For example, the Commission cited a report of a New York City task force on CATV which foresaw a possibility of eighteen channels being available to City viewers within two or three years, three of which would be reserved to the City and four of which would be available for private local program origination. Notice of Proposed Rule-Making and Notice of Enquiry, 33 Fed.Reg. 19028, 19029 (1968).

15. Apparently, it is now the Commission's view that, in order to even the economic

battle between CATV and broadcasting stations in general, it is necessary to force CATV to compete financially for the programming of distant stations. Whether "retransmission consent" will be a successful means for reaching that end is yet unclear, but its probable effects may become more evident in the proceedings following upon the Proposed Rule.

16. *See* Notice of Proposed Rule-Making and Notice of Enquiry, ¶ 53, 33 Fed.Reg. 19028, 19036 (1968).

it ordered that a hearing be held, since Multi-Channel Cable Co. intended to import distant independent VHF signals into a central city of the market for which a construction permit for a UHF facility had already been issued. As to the other applications, those in Benton and in the Illinois towns, the Commission thought waivers appropriate:

All of these communities are located at a distance from the central cities, and with the exception of Carbondale and Marion have populations of less than 10,000. Additionally, there is a construction permit outstanding for channel 29, Paducah, and the permittee filed comments stating that it has no objection to the CATV proposal for Benton. There are no UHF allocations for the Illinois section of the market. There is an idle UHF allocation in Cape Girardeau, but the community nearest to it with a CATV proposal is 35 miles away. The remaining stations in the market are all basic network affiliates and have made no showing which would indicate that carriage and nonduplication will not " * * * contribute very substantially to insuring [their] viability." Second Report, 2 F.C.C.2d 725, 783. Finally, most of the signals to be imported place a predicted Grade B signal into part of the market and are receivable off the air. Cf. Fetzer Cablevision, Inc., et al., FCC 67–223, 6 F.C.C.2d 845; CATV of Rockford, Inc., et al., FCC 67–248, 7 F.C.C.2d 619.

In addition, citing Clinton TV Cable Co., Inc., 11 F.C.C.2d 704 (1968), the Commission found that "the theoretical maximum cumulative effect" of granting the waivers, assuming identical disposition of any requests from other communities similarly situated in the market, would be fifteen per cent of the television homes in the market. Finally, in its brief to this court the Commission has proffered an additional powerful justification for the Commission's decision, namely, that the commitment of the CATVs in the Illinois towns to carry the Paducah UHF channel 29, once it came on the air, would benefit, rather than forestall, UHF development in the region, since the projected grade B contours of that station would not otherwise extend to include the portion of the Paducah market served by these CATVs.[17]

## V

Although petitioners in this court, who were intervenors before the Commission, argue for reversal of the Commission on the basis of various legal theories, all their arguments basically attack the decision of the Commission to waive a hearing as being arbitrarily and capriciously reached on the basis of inadequate facts and unwarranted inferences. For legal support, they look to Channel 9 Syracuse, Inc. v. FCC, 128 U.S.App. D.C. 187, 193, 385 F.2d 969, 975 (1967), where this court stated:

We do suggest, however, that in the emerging field of CATV, with respect to petitions for waiver of evidentiary hearings, the Commission should require greater factual specificity in petitions for waiver and in the proof, and its decisions should more clearly articulate the public interest considerations on which it determines to waive.

Primarily, however, their argument is factual and their basic complaint is that the Commission should not have granted the CATV applications without holding hearings which they assert would have developed facts adverse to those applications and contrary to the allegedly inadequate findings of the Commission. In this regard, it seems useful to summarize, from petitioners' original brief,

17. Petitioners do not challenge this argument on its merits, even though it takes account of technical considerations not contemplated in the Second Report and Order. They do, however, point to First Illinois Cable T.V., Inc., 14 R.R.2d 757, 759 (1968), as warrant for not considering a UHF expression of approval for proposed CATVs. But, as shown below, First Illinois Cable is easily distinguishable from the case at bar.

the eight principal areas where petitioners dispute Commission findings of fact or conclusions of law.[18]

1) The Commission does not adequately articulate how it reached the conclusion that the Paducah market has "an unusually large rural population—generally not available to CATV;"

2) The Commission incorrectly draws the inference, from its finding of unusually large rural population, that there is an adequate economic base for existing and potential stations in the market;

3) The Commission's statement that the Illinois towns are all "located at a distance from the central cities and with [two exceptions] * * * have populations of less than 10,000" is vague, uncertain in its intended effect, and simply wrong if by the statement the Commission means to imply that the impact on prospective stations from CATV in towns under 10,000 would be minimal in a market of this size;

4) The Commission's assertion that "there are no UHF allocations for the Illinois section of the market" should not be permitted to serve as camouflage for its failure adequately to assess the damage which the Illinois CATVs would wreak upon the UHF al-

locations in Paducah, Cape Girardeau, and other sites not yet allocated;

5) The Commission's finding that most of the distant signals to be imported are presently receivable off the air in the market is irrelevant, not supported by the record, and an inappropriate argument in light of the Commission's own normal presumptions with respect to the Grade A and Grade B contours of broadcast stations;

6) The Commission's finding that the "maximum cumulative effect" of these CATVs could be computed at fifteen per cent (a) is based on data not of record, (b) relies on prior cases which themselves are secretive and incomprehensible in the manner in which they calculate CATV penetration,[19] (c) is incorrect in assuming that the impact would be so small, and (d), even if correct, represents a significant enough impact to have the Commission call for a hearing to develop the facts further;

7) The Commission's reliance on the assertion that the VHF stations have not demonstrated that carriage and nonduplication protection would not procure their viability is misplaced, considering that the presumptions in top-100 market cases favor hearings

18. Petitioners also argued in their principal brief that the Commission's action here was at odds with other decisions issued since the *Second Report*, and in their supplemental brief, submitted after oral argument and the issuance of the *Proposed Rule*, that the new Commission policies were based on factual assumptions inconsistent with the underlying bases for its decision in this case. The latter contention is treated *infra*. As to the former, the only important decisions cited by petitioners not otherwise treated herein are (1) United Transmission, Inc., 9 F.C.C. 2d 773 (1967), where the Commission denied a waiver of hearing for the carriage of distant signals by a CATV system in Galax, Virginia, a town of only about 5,000 population, but also a town located within two top-100 markets in which were located nine UHF allocations, and (2) Lone Star Television, 14 R.R.2d 346

(1968), where a waiver of hearing was denied to a Marshall, Texas, CATV system, partially because of the objections of a UHF permittee whose grade B contour did not extend to Marshall, Texas—and whose signals the CATV apparently did not intend to carry, in contrast to the Illinois towns here—but who anticipated that it would be able to extend its signal further in the future, but partially also because a UHF allocation, though dormant, had been granted to Marshall itself. Petitioners, in other words, have not cited cases in which the Commission has acted inconsistently with its decision here.

19. The Commission seemed to rely on Clinton TV Cable Co., Inc., 11 F.C.C.2d 704 (1968). The approach there taken, however, has been severely criticized, Vicksburg Video, Inc., 13 R.R.2d 929, 931 (1968) (Cox, Comm'r dissenting).

and place the burden of persuasion upon the CATV applicants; and

8) The Commission's reliance upon the fact that the UHF permittee did not oppose the Benton application[20] was in error in that the public interest, not the opinion of the UHF operator, should be the controlling factor in deciding whether a hearing ought to be held.

## VI

■ This court is concerned by the manner in which the Commission reached its decision, for many of the points which petitioners have made identify weaknesses in the Commission's approach, cutting much of the ground out from under the Commission's decision. In this respect it is unfortunate that the Commission did not elucidate further the reasoning behind some of its summary conclusions, and did not focus more sharply on the primary justifications for choosing to waive a hearing in this case. Most of the petitioners' objections, however, are easily disposed of. For example, regardless of what measure the Commission might have used to define "rural," there can be no question that this market has a larger percentage of television homes inaccessible to CATV, given the current development of CATV technology, than almost all other top-100 markets. Furthermore, these rural viewers are bound to watch only the local channels and will thus afford those channels an expanded base of operations without competition. As for those statements of the Commission which the petitioners found vague or irrelevant, such as its generalizations about the Illinois towns and its reliance upon current reception of distant signals, it is apparent that these were not statements specifically relied on by the Commission in

reaching its conclusion, but merely supplied a background for its ultimate decision on CATV impact.

It is this decision, that CATV would not have the devastating impact upon UHF in the Paducah market which the Commission was attempting to forestall in the *Second Report*, that petitioners seek to overturn. In the opinion of this court, however, sufficient rational basis for the Commission's decision remains even after the petitioners' points have been tallied up, and certainly it must be said that sufficient evidence on the record as a whole supports the Commission's decision. The Commission's task in assessing the CATV applications for waiver of hearings in this case was to decide whether they had provided sufficient specific information about their potential impact on the Paducah market to warrant the Commission's not looking further, through the medium of hearings, before it decided whether or not to grant the applications. On this score, the Commission seems to this court to be on firm ground in relying upon two essential arguments.

The first, and most important, is that there was no UHF opposition to their proposals. The only commercial UHF then in the market actually favored the Illinois towns' proposals, and was also satisfied that the Benton proposal would on balance not jeopardize its position in the market. Petitioners argue that the Commission was not entitled to rely on this point, and have directed our attention to another Commission decision, First Illinois Cable T. V. Inc., 14 R.R.2d 757, 759 (1968), in which the Commission said:

"First Illinois further argues that the failure of any UHF station to object to its proposal is entitled to substantial weight in support of its waiv-

---

**20.** Nor did it oppose the other applications, but the Commission, in its opinion, mentioned only its nonopposition against Benton. Since petitioner here, however, has not controverted the assertions of the other CATVs and the Commission that the UHF would be benefitted, rather than hurt, by the extended coverage it would receive through the advent of CATV in the Illinois towns, the court may safely rest assured that the UHF permittee had good reason for not opposing CATV in the Illinois towns.

er request, but we do not agree. There may be many reasons why the permittee or licensee of a UHF station deemed it to be to his personal advantage not to object to the CATV's importation of distant signals, but our primary concern is with the public interest in the maintenance and growth of UHF, not with the private economic interests of the said licensee or permittee."

*First Illinois Cable*, however, is distinguishable from the instant case in two important respects. First, the Commission there pointed out that the UHF permittee had an option on fifty per cent of the stock of the CATV applicant, thereby rendering its nonopposition nugatory. Second, the holdings of the two cases are entirely consistent in that they place primary emphasis upon the importance of UHF development, a factor which, on the evidence adduced in *First Illinois*, pointed to the suppression of CATV, but which in the Paducah market, where the UHF would as a result of CATV actually get a larger market, pointed directly towards the granting of the CATV applications.

Having established that the primary purpose of the *Second Report*—that all UHF development which is within reasonable contemplation in the foreseeable future be protected—was not ill-served by CATV penetration into this market, the Commission was justified in relying on a second argument, based on the "uniqueness" of the market and its position near the bottom of the top-100 markets, to approve the intrusion of CATV into the market. What does not make sense in a market with a center city of substantial size, may well call for different results in a market stretched over a considerable area, without any

larger cities, and with a substantial population not reachable by CATV. Petitioner disputes the Commission's reference to an unusually large rural population, but it would be blinking reality not to concede that, in a market of this type, a substantial number of television homes are unavailable to CATV because of the technical and economical difficulties which are involved in setting up CATV where there is not a fairly high level of concentration of population. Whereas petitioners generally conceded that the market is unique,[21] they argued that the nature of the market was such that the population of the central cities of the market was insufficient to support UHF development, and that the support of the other towns, whose population were individually comparable to the principal cities and in combination much greater than even the largest of the principal cities, would be required for UHF development. Yet it is these very towns, so the petitioners have argued, into which the Commission is allowing CATV to penetrate to the detriment of UHF. This argument, however, when pitched in terms of UHF development, rather than VHF protection, a tack which petitioners here studiously and perhaps wisely [22] eschewed, carries little weight when the evidence supports the contrary conclusion that UHF development would be benefitted by CATV penetration.

In light of this support for the Commission's decision, petitioners' clearly legitimate complaint about one of the Commission's conclusions is insufficient to prompt this court to reverse the Commission. It is important, nevertheless, to point out that the Commission here was skating on thin ice when it fixed upon fifteen per cent as the figure assessing "maximum cumulative impact"

---

21. It should be pointed out that the Illinois CATVs were able to point to at least one other similar market, Harrisburg-Lancaster-Leban-York, Pennsylvania, where the Commission waived hearings and CATV systems were permitted to carry distant signals. Lebanon Valley Cable T. V. Co., 10 R.R.2d 273 (1967); Susquehanna Broadcasting Co., 9 R.R.2d 1133 (1967).

22. *See* Pikes Peak Broadcasting Co. v. FCC, Nos. 22023–24 (March 24, 1969), cert. denied, 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (U.S. June 23, 1969).

of CATV upon the television homes in this market. The Commission's brief in this court made no effort to justify the accuracy of its impact analysis conclusion, preferring to rely on the somewhat lame argument that, if petitioners disputed its conclusion, they could have raised the point in a petition for reconsideration.

█ In light of the Commission's subsequent conclusions about the impact of CATV penetration in its *Notice of Proposed Rule-Making*, which seem to this court to establish definitively that the maximum cumulative impact of CATV will be much greater than fifteen per cent, its stance on this appeal is understandable, though not excusable. This court has encountered as much difficulty in understanding how the Commission's figure was arrived at and has as little confidence in its accuracy as had Commissioner Cox in Vicksburg Video Inc., 13 R.R.2d 929, 931 (1968). If the Commission is to use its own staff study as a basis for making a calculation which is extremely important in reaching its decision, it must state in detail the procedures behind the study and the assumptions made in carrying it out. The only consideration which saves the Commission here is that, even assuming that the impact of CATV in fact will be substantially larger than that contemplated by the Commission's study, under the standard in effect during the reign of the *Second Report*, it would still not have overborn the other considerations favoring CATV in this market.

At least in the period between the adoption of the *Second Report and Order* and the institution of the interim procedures of the December, 1968, proposed rule, it was the position of the Commission that the expansion of CATV was in the public interest in those situations in which it did not seriously conflict with the further development of UHF television. This policy was a rational one, conceived after prolonged deliberation by an agency charged with the duty to oversee the communications media and hopefully possessed of as much expertise as any governmental body may be expected to have in an area in which technological innovations have been so enormous and so speedy that the task of regulation has become increasingly difficult. This policy has since been altered—with new emphasis placed on program origination and on the unfair competition which CATV provides—but this court is confident that no injustice is done, even in light of the Commission's new policies, if the Commission here is affirmed and the CATVs permitted to begin operations serving the residents of seven small towns which presently have inferior television service.

Affirmed.