COLUMBIA BROADCASTING SYSTEM, INC., et al., Plaintiffs-Appellants,

v.

TELEPROMPTER CORPORATION and Conley Electronics Corporation, Defendants-Appellees.

No. 353, Docket 72–1800.

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1973.

Decided March 8, 1973.

Asa D. Sokolow and Seymour Graubard, New York City (Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for appellant Columbia Broadcasting System, Inc.; Marshall, Bratter, Greene, Allison & Tucker, New York City, for appellant Calvada Productions; Alexander & Green, New York City, for appellant Jack Chertok Television, Inc.; Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for appellant Dena Pictures, Incorporated, on the brief), for appellants.

Robert C. Barnard, Washington, D. C., and Julius Levy, New York City (Cleary, Gottlieb, Steen & Hamilton, New York City, R. Michael Duncan, Washington, D. C., of counsel, and Katz, Rosensweig & Sindle, David Z. Rosensweig, New York City, of counsel, on the brief), for appellees.

Paul, Weiss, Rifkind, Wharton & Garrison, Herman, Finkelstein, Simon H. Rifkind, Jay H. Topkis and Paul L. Laskin, New York City, on the brief, amicus curiae for American Society of Composers, Authors and Publishers.

Stuart F. Feldstein, Charles S. Walsh and Stephen A. Gold, Washington, D. C., on the brief, amicus curiae for National Cable Television Association, Inc.

Phillips, Nizer, Benjamin, Krim & Ballon, Louis Nizer, Gerald Meyer and Gerald F. Phillips, New York City, of counsel, on the brief, amicus curiae for Motion Picture Association of America, and others.

Before LUMBARD, KAUFMAN and MANSFIELD, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiffs-appellants, Columbia Broadcasting System, Inc. (CBS), Calvada Productions, Jack Chertok Television, Inc., and Dena Pictures, Incorporated appeal from a final judgment entered after trial in the Southern District. Appellants commenced this copyright infringement action [1] against defendants-

---

[1]. The original action was commenced on December 11, 1964. Attempts to consolidate this action with United Artists Television v. Fortnightly, 255 F.Supp. 177 (S.D.N.Y.1966), aff'd 377 F.2d 872 (2d Cir. 1967), rev'd 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), in the district court were unsuccessful. The parties voluntarily stayed proceedings in this case while *Fortnightly* was on appeal. After the *Fortnightly* decision, supplemental complaints were filed on December 15, 1969 and May 17, 1971.

342

appellees, Teleprompter Corporation (Teleprompter) and its subsidiary Conley Electronics Corporation, who own and operate numerous Community Antenna Television (CATV) systems throughout the country. Appellants are creators and producers of television programs that were protected by statutory copyrights and that were licensed to television stations affiliated with the CBS Television Network, a division of CBS, and to several independent television stations. The complaint alleged that the Teleprompter cable systems intercepted the signals of television stations broadcasting appellants' copyrighted works and then channeled these programs to their paying subscribers without authorization or license, thereby infringing appellants' copyrights.[2] After trial,[3] the district court, holding that the reception of telecasts of appellants' copyrighted programs by Teleprompter's CATV systems and the distribution of these programs to CATV subscribers did not infringe appellants' copyrights, entered judgment dismissing the complaint. From that judgment, appellants have taken this appeal.

The pertinent facts were the subject of two lengthy stipulations and are basically undisputed. The legal issue concerns the proper interpretation to be given to § 1(c) and (d) of the Copyright Act of 1909, 17 U.S.C. § 1(c) and (d).[4] This provision gives the copy-

2. Appellants claim to have been injured because Teleprompter's CATV systems distributed signals of stations carrying the copyrighted programs to viewers who could not otherwise have received them. When a CATV system brings a program into its market from a more distant television market, appellants assert that this has a serious adverse impact on the copyright holder's ability to license that program for later presentation in the importing market.

We have been informed by one of the *amici* that a copyright holder usually licenses his programs first to a network and later to local stations for broadcast. The larger markets are ordinarily licensed first because of the greater demand caused by competition among the more numerous broadcast stations in those markets. We are told that if a CATV system brings into the smaller markets programs that are broadcast by network or independent stations in the larger markets, it reduces the potential audience for that program when it is later licensed for exhibition by a local station. As a result, the fee that the station in the smaller market is willing to pay for the right to broadcast the program will diminish, appellants assert, to the injury of the copyright holder.

Teleprompter has argued that the copyright holder can demand a greater fee from the broadcast station in the larger market in light of the greater audience that will now view the programs as a result of CATV. However, appellants have responded, and we must agree, that the amount that a broadcast station is willing to pay for the privilege of exhibiting a copyrighted program is economically tied more to the fees that advertisers are willing to pay to sponsor the program than to some projected audience size. No evidence was presented in the court below to show that regional or local advertisers would be willing to pay greater fees because the sponsored program will be exhibited in some distant market, or that national advertisers would pay more for the relatively minor increase in audience size that CATV carriage would yield for a network program. Indeed, economics and common sense would impel one to an opposite conclusion.

3. By pre-trial order, the trial of this case was divided into separate stages. The first stage, on appeal here, concerned the issue of whether or not Teleprompter had infringed appellants' copyrights.

4. "Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

. . . . .

(c) To deliver, authorize the delivery of, read, or present the copyrighted work in public for profit if it be a lecture, sermon, address or similar production, or other nondramatic literary work; to make or procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, delivered, presented, produced, or reproduced; and to play or perform it in public for profit, and to exhibit, represent, produce, or reproduce it in any manner or by any method whatsoever . . . and

(d) To perform or present the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend

right holder the exclusive right, *inter alia*, to perform the copyrighted work. The issue here, therefore, is whether Teleprompter's CATV systems "performed" the copyrighted works within the meaning of this provision. In resolving this question, we are not writing on a clean slate, for the Supreme Court, on somewhat different facts, considered the meaning of "perform" in this provision in Fortnightly Corp. v. United Artists, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). Relying on *Fortnightly*, the district court held that the CATV systems here did not "perform" the copyrighted works.

The allegations of infringement were limited to an illustrative group of copyrighted programs. Similarly, the complaints charged five specific and illustrative CATV systems with having infringed appellants' copyrights, although presumably other CATV systems owned by Teleprompter conducted similar activities. As a result, the copyright claims at issue involve, and are limited to, the operations of Teleprompter's CATV systems in five cities at stated periods: Elmira, New York in November 1964; Farmington, New Mexico in November 1964, June 1969, and March 1971; Rawlins, Wyoming in June 1969; Great Falls, Montana in June 1969; and New York City in June 1969 and March 1971. A knowledge of the operations of each of these systems is essential to an understanding of our resolution of the issues.

*Elmira:* In November 1964, the date of the only infringement alleged with regard to the Elmira CATV system, the system had the capacity to carry twelve television channels. It received and provided its viewers with the programs of ten television broadcast stations located in Elmira and in communities varying from 46 to 173 miles away. Broadcasts from CBS affiliates, as well as from some stations with other network affiliations, in Buffalo (119 miles), Scranton (76 miles), Syracuse (64 miles), and Binghamton (46 miles) were received off-the-air [5] at the system's antenna site on a hill adjacent to Elmira and were made available to the system's subscribers. Because of distance and topographical conditions, satisfactory reception of the stations in Buffalo and Scranton is not available by means of rooftop antennas in most locations in and around Elmira. Satisfactory reception of the Syracuse stations is available only in some locations in the northern portion of Elmira. One of the Binghamton stations can be satisfactorily received from rooftop antennas, but the other station cannot. In addition, the Elmira system had two channels that were provided by means of microwave links.[6] One of these was licensed to the

---

any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced or reproduced; and to exhibit, perform, represent, produce, or reproduce it, in any manner or by any method whatsoever . . ."

5. The term, "off-the-air," will be used throughout this opinion to indicate the reception of broadcast television signals by means of an antenna or similar receiving equipment. We use the term, "broadcast," in accordance with the definition given to "broadcasting" in 47 U.S.C. § 153(*o*). Thus, "off-the-air" reception does not include the reception of microwave transmission. See note 6, *infra*.

6. A microwave link involves the transmission of signals through the air. However, microwave transmission in itself is not broadcasting. A broadcast signal, according to 47 U.S.C. § 153(*o*), is transmitted by a broadcaster for "[reception] by the public." In the case of microwave, the signal is focused and transmitted in a narrow beam aimed with precision at the receiving points. Thus, microwave transmission is point-to-point communication. The receiving antenna must be in the path of the signal beam. If the transmission must cover a considerable distance, the microwave signal is transmitted to the first receiving point from which it is re-transmitted to another receiving point, and this process is repeated until the signal reaches the point from which it is distributed by cable to subscribers.

school system, which originated educational programming that was transmitted by microwave from the schools to the CATV system for distribution. The second microwave link served to connect the system with an antenna nearer New York City, where a New York independent station was received off-the-air. None of the copyrighted programs was broadcast by this independent station.

*Farmington:* On two of the dates of alleged infringement, November 1964 and June 1969, Teleprompter operated a five-channel system in Farmington. The system received and distributed to its subscribers the signals of four broadcast stations, all of which were received off-the-air on antennas located on a mesa thirty miles from Farmington. Originally, all the stations were from Albuquerque, New Mexico (144 miles from Farmington); later, a station from Durango, Colorado (43 miles) was added during periods when one of the Albuquerque stations was not broadcasting. Because of distance and mountainous terrain, reception of the Albuquerque stations directly off-the-air by means of rooftop antennas was not feasible. However, the Albuquerque stations, including a CBS affiliate that broadcast several of the copyrighted programs, were received in Farmington on rooftop antennas because they were rebroadcast by "translators" [7] under a license issued by the Federal Communications Commission and pursuant to authorization given by CBS and the station. The mountainous terrain also made it impossible to receive by means of rooftop antennas the Durango station, which is also a CBS affiliate. This Durango station, however, entered into a letter agreement with the Farmington CATV system in which it authorized the latter to distribute the station's programming to its subscribers.[8]

By March 1971, the third date of alleged infringement, the system had been rebuilt with twelve-channel equipment. At this time, it received and distributed the broadcasts of nine stations: four from Albuquerque, one from Durango, and four independent stations from Los Angeles (600 miles from Farmington). Obviously, the Los Angeles stations were not receivable from rooftop antennas in Farmington. These stations were received on an antenna located approximately fifty miles from Los Angeles and linked with the Farmington system by a microwave system, 1300 miles in length.

On the one additional channel available to the system in 1964 and 1969, it originated some limited programming, which consisted of general interest programs such as local news, sports, and movies, an automated time and weather scan,[9] and occasionally some educational programs. When the channel capacity had increased in 1971, the automatic time and weather scan was originated on a non-broadcast channel [10] on a full-time basis. On a second non-broadcast channel, educational programming was offered. And on the third available channel, the CATV system originated twenty hours per week of general interest programs.

*Rawlins:* At the time of the alleged infringement, in June 1969, the Rawlins CATV system had a twelve-channel capacity. The system received and made available to its subscribers programming from six broadcast stations, five from Denver, Colorado (184 miles from Rawlins), on which the copyrighted programming was carried, and one from

---

7. A "translator" is a television broadcast translator station that is authorized to rebroadcast a specific station's signals.

8. Teleprompter has not attempted to show that this letter agreement amounts to an authorization or license for its carriage of the copyrighted programs. The parties stipulated that no such authorization or license was requested or received.

9. This consisted of an automated camera that scanned clock and weather dials.

10. A "non-broadcast channel," as used in this opinion, is a channel that offers a CATV system's own original programming but does not offer programs received from broadcast stations.

Casper, Wyoming (87 miles from Rawlins). The system received the Denver stations, which could not be received in Rawlins from rooftop antennas, off-the-air on antennas located ninety miles from Denver, and transmitted them by microwave link to Rawlins. The Casper station was received off-the-air on an antenna located at the edge of town. Because of mountainous terrain, reception of the Casper station directly off-the-air by rooftop antennas was not generally possible; however, the Rawlins audience did receive its broadcasts as a result of rebroadcasts by a translator. At the time of the alleged infringement, the only program origination on non-broadcast channels that the CATV system produced was an automated time and weather scan.

*Great Falls:* The Great Falls CATV system was a twelve-channel system at the time appellants allege it to have infringed their copyrights. It received and distributed to its subscribers programming of nine broadcast stations. Three of the stations (including the one that broadcast the program whose copyright is alleged to have been infringed) were in Spokane, Washington (286 miles from Great Falls), one was in Lethbridge, Canada (163 miles away), two were in Salt Lake City (466 miles away), and one was in Helena (71 miles away). The system received the signal of each of these stations off-the-air by means of antennas located at varying distances from the originating stations (17 to 95 miles) and transmitted it by microwave to a point in Great Falls, from which it was distributed by cable to the system's subscribers. Because of distance, mountainous terrain, and the limitations of the individual stations, the Great Falls audience could receive none of these broadcast stations by means of rooftop antennas. In addition, the system received the signals of two Great Falls stations off-the-air by means of antennas located in the community, and distributed these signals to its subscribers. On a non-broadcast channel, the system offered an automated time and weather scan. On another non-broadcast channel, the system originated ten hours per week of movies and local interest programs.

*New York:* At the time of the first alleged infringement, in June 1969, Teleprompter's New York CATV system had a twelve-channel capacity. By March 1971, the time of the second alleged infringement, its capacity had increased to thirteen channels. Under the terms of the system's franchise, it must receive and distribute all eleven New York City stations and is barred from importing any stations from outside New York City. From time to time, microwave has been used to connect the system's main antenna with two subsidiary antennas. The signals of the New York stations were received off-the-air by these antennas and distributed by cable to the subscribers. The New York system, on its non-broadcast channels, offered several forms of automated originations, in addition to originating from forty to seventy hours of local and general interest programming per week. In connection with one of the latter types of originations, a sports event, the Teleprompter system sold some commercial time and interconnected with other CATV systems in the New York area.

### I. *Fortnightly Corp. v. United Artists, Inc.*

The starting point in our analysis of appellants' copyright-infringement claims must, of course, be the Supreme Court's decision in Fortnightly Corp. v. United Artists Television, Inc., *supra.* In deciding whether the Fortnightly CATV system "performed," within the meaning of the Copyright Act, the programming that it provided to subscribers, the Court applied a functional test and held that the CATV system there involved was functionally related more to the television viewer, who does not "perform," than to the television broadcaster, who does "perform." In this regard, Mr. Justice Stewart, speaking for the Court, said:

> The television broadcaster in one sense does less than the exhibitor of a

motion picture or stage play; he supplies his audience not with visible images but only with electronic signals. The viewer conversely does more than a member of a theater audience; he provides the equipment to convert electronic signals into audible sound and visible images. Despite these deviations from the conventional situation contemplated by the framers of the Copyright Act, broadcasters have been judicially treated as exhibitors, and viewers as members of a theater audience. Broadcasters perform. Viewers do not perform. . . .

When CATV is considered in this framework, we conclude that it falls on the viewer's side of the line. *Essentially, a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals;* it provides a well-located antenna with an efficient connection to the viewer's television set. (Emphasis added.) 392 U.S. 390, pp. 398–399, 88 S.Ct. 2084, pp. 2088–2089.

■ The teaching of *Fortnightly* is that a CATV reception service that receives broadcast signals off-the-air from an antenna or other receiving equipment erected within or adjacent to the community it serves, and distributes the programming received to subscribers, does not "perform" the programs and, thus, is not subject to copyright liability, even though the subscribers could not otherwise receive the programs without the aid of CATV. Appellants correctly note that the operations of each of the CATV systems involved here were different and broader than those of the system before the Supreme Court in *Fortnightly*. Fortnightly's system provided a simple reception service and consisted of "antennas located on hills above each city, with connecting coaxial cables, strung on utility poles to carry the signals received by the antennas to the home television sets of individual subscribers." *Fortnightly*, p. 392, 88 S.

Ct. p. 2085. Although *Fortnightly* was decided in 1968, the litigation in that case had been instituted in 1960, and, as a result, the Court considered CATV in a state of technology that was then eight years out-of-date. Hence, the Court did not have before it a system that originated programming on non-broadcast channels, that sold commercials on its origination programming, that had the capacity to interconnect with other CATV systems, that utilized microwave links in bringing broadcast signals to its subscribers, and that imported signals from stations located hundreds of miles away from the community that the system was intended to serve. Appellants' counsel inform us that the Supreme Court was made aware of the changing technology of CATV by counsel for *amici* and by counsel for Fortnightly (who represent Teleprompter here). Indeed, the Court's opinion in at least two places implied that it was aware of this fact and was not necessarily laying down a broad rule to apply to all CATV systems regardless of the nature of their operations.[11]

The question before us is whether the character of CATV is so changed by the additional services that the cable systems here have undertaken that their total operation, including the reception service, under the *Fortnightly* functional test, have become functionally equivalent to those of a broadcaster, and thus these systems should be deemed to "perform" the broadcast programming that they distribute. The additional operations undertaken by these CATV systems, which appellants contend distinguish this case from *Fortnightly* and bring about this asserted metamorphosis in the character of CATV, are the following: 1) origination of programming on non-broadcast channels, and the sale of commercial time on such non-broadcast programming; 2) interconnection with neighboring CATV systems; 3) use of microwave links in bringing broadcast

11. *See* Fortnightly Corp. v. United Artists, Inc., 392 U.S. 390, 392 n. 6, and 399 n. 25, 88 S. Ct. 2084, 20 L.Ed.2d 1176 (1968).

programming to subscribers; and 4) the importation of distant broadcast signals from outside the area served by the CATV system. We shall consider in order the effect of each of these operations on the application of the *Fortnightly* doctrine to the CATV systems involved.

## II. *Non-broadcast Program Origination*

At the outset, we reiterate that what is involved here is the origination of programming on channels not used for the distribution of broadcast signals and the sale of commercials on such non-broadcast channels. We do not have before us, and thus do not consider, the question of what the effect would be on the *Fortnightly* doctrine if programs originated by the CATV system were used to replace selected broadcast programming received from network or independent stations that would otherwise have been distributed without alteration to subscribers on broadcast channels. Similarly, we do not have before us a CATV system that sold commercials on broadcast programming to replace the commercials sold and transmitted by the broadcast station.

Although the Supreme Court noted in *Fortnightly* that it was not dealing with a CATV system that originated non-broadcast programming,[12] we fail to see why a system's program origination on channels other than those on which it relays broadcast programming should alter the result in *Fortnightly*. Obviously, the system "performs" those programs that it originates for distribution to its subscribers. However, we do not see the logic in appellants' contention that this program origination serves to convert the CATV system into a "performer" of those programs that it distributes to its subscribers on broadcast channels. Even though the origination service and the reception service are sold as a package to the subscribers, they remain separate and different operations, and we cannot sensibly say that the system becomes a "performer" of

the broadcast programming when it offers both origination and reception services, but remains a nonperformer when it offers only the latter.

In support of their contention, appellants point to Associated Music Publishers, Inc. v. Debs Memorial Radio Fund, Inc., 141 F.2d 852 (2d Cir.), cert. denied, 323 U.S. 766, 65 S.Ct. 120, 89 L. Ed. 613 (1944). In that case, the defendants had argued that they should not be subject to copyright liability for programs that they broadcast without advertising support but merely as a service to their listeners. This court rejected that contention, noting that the programs, even without advertising, served to increase the total number of station listeners and thus helped to maintain the station as a successful financial entity. Appellants argue that *Debs* supports their position that the various functions of the CATV systems should be considered as a whole to determine whether the system is functionally equivalent to a broadcaster, in which event it should be deemed a "performer" with regard to all programming it relays to its subscribers. This argument is but a general statement of appellants' particular contention that non-broadcast program origination converts the system into a "performer" with regard to broadcast programming distributed to subscribers.

*Debs*, however, does not support either proposition. The issue there was not whether the programs had been "performed"—indeed, having broadcast the programs, the station could hardly contend it was not a "performer"—but whether the programs had been performed *"for profit"*; and one can readily see that indirect "profit" accrued to the station in *Debs* as a result of its unadvertised broadcast of these programs. That decision is not authority for appellants' broad proposition that the operations of a CATV system must be viewed and evaluated for copyright purposes as a whole; and, thus, neither can it sup-

12. Note 11, *supra.*

port the contention that a system's non-broadcast program origination converts it into a "performer" of broadcast programs distributed to subscribers by its reception service.

Therefore, we hold that the fact that certain of the CATV systems involved here originated programming on non-broadcast channels did not make them "performers," for copyright purposes, of broadcast programming distributed to subscribers. A contrary approach would be unnecessarily wooden and mechanical in its application of copyright law to CATV.[13]

■ With regard to the sale of commercial time on non-broadcast programming, although this is another step bringing cable origination programming in competition to some extent with broadcast programming, again, we do not agree with appellants' position that there is some sort of "spill-over" effect by which the system becomes a "performer" with regard to its reception service.

### III. *Interconnection*

■ As noted earlier, Teleprompter's New York CATV system has occasionally interconnected its facility with those of the two other CATV systems operating in the New York area. Appellants analogize this activity to the networking that is common among broadcast stations, and they point to this as another factor making the New York system functionally equivalent to a broadcaster. However, the only interconnection with which we are concerned occurred in two instances of sporting events that the system originated on non-broadcast channels. There was no interconnection here relating to the reception of any telecast of appellants' copyrighted programs, or indeed of any broadcast programming, received by the system and distributed to subscribers. Therefore, we are not presently in a position to evaluate what effect interconnection may have on CATV copyright liability if and when it ever reaches the point at which it is equivalent to a network of CATV systems. In light of the minimal interconnection we have before us, we must agree with the district court that "[w]hatever this brief interconnection may portend for the future, it [did] not transform [Teleprompter's] present CATV system into a broadcasting network as [appellants] suggest."

### IV. *Microwave*

■ A relatively recent development in CATV technology that was not before the Court in *Fortnightly* is the use of microwave to transmit a broadcast signal from the point of its reception off-the-air to the point from which it is distributed by cable to the homes of subscribers. Typically, microwave is used to import distant signals into the CATV community, an activity the effect of which on the issue before us we shall consider below.[14] However, the use of microwave is not necessarily limited to this activity.

Appellants contend that the use of microwave, in and of itself, is sufficient to make a CATV system functionally

---

13. The Federal Communications Commission has adopted rules, which appear in 47 C.F.R. § 76.201, requiring CATV systems with more than 3,500 subscribers to commence program origination, which is known in industry parlance as "cable-casting." These rules were suspended pending judicial review of the FCC's CATV rules. Although FCC authority over CATV was sustained in United States v. Midwest Video, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972), the FCC has not yet reinstated the rules.

14. Although we consider them separately, the use of microwave and the importation of distant signals are often very closely connected, in the sense that microwave links are the usual means by which a CATV system imports distant signals. As is evident from the experience of the New York system, however, it is possible for microwave to be used apart from distant signal importation, and it is in this sense that we consider in this section of the opinion the effect of microwave on the application of *Fortnightly* to CATV systems.

equivalent to a broadcaster and thus subject to copyright liability for all the programming it receives and distributes to its subscribers. We are unconvinced by this contention. Neither do we believe that the use of microwave makes the system a "performer" only of that programming with respect to which the microwave is used. Microwave utilizes point-to-point communication and is merely an alternative, more economical in some circumstances, to cable in transmitting a broadcast signal from one point in a CATV system to another. Hence, we see no reason to attach legal significance, in terms of copyright liability, to the decision to utilize microwave links.

### V. *Importation of Distant Signals*

Appellants' final and, in the end, most persuasive contention relates to the fact that certain of the CATV systems involved here distributed to their subscribers signals from broadcast stations located many miles from the communities served by the systems. In CATV parlance, this is known as the importation of distant signals. This activity was not before the Supreme Court in *Fortnightly*, and appellants contend that that decision did not signify that a CATV system does not "perform" a copyrighted television program when it brings the signal in from another community, often from another television market, and distributes that signal to subscribers.

The CATV system in *Fortnightly* brought television signals to viewers who could not otherwise have received them. However, these signals were already in the community and were not imported by the CATV system from another community, as is evidenced by the fact that the system received them from an antenna located in or directly adjacent to the CATV community. It was only because of topographical conditions in and around the community that residents could not receive the signals on their receivers. Thus, it was the office of the CATV system in *Fortnightly* to use its advanced antenna technology and equipment to overcome these adverse

conditions and thereby to bring the signals to members of the community. The Supreme Court held that, in performing this function, the CATV system did not "perform," within the meaning of the Copyright Act, the programming carried on those signals. However, in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), decided just one week before *Fortnightly*, the Court explicitly recognized that this was only one of two major services that CATV systems render to the communities they serve. In this regard, Mr. Justice Harlan, speaking for the Court, stated at p. 163, 88 S.Ct. at P. 1998:

> CATV systems perform either or both of two functions. First, they may supplement broadcasting by facilitating satisfactory reception of local stations in adjacent areas in which such reception would not otherwise be possible; and second, they may transmit to subscribers the signals of distant stations entirely beyond the range of local antennae.

When a CATV system is performing this second function of distributing signals that are beyond the range of local antennas, we believe that, to this extent, it is functionally equivalent to a broadcaster and thus should be deemed to "perform" the programming distributed to subscribers on these imported signals. See Select Theatres Corp. v. Ronzoni Macaroni Co., 59 U.S.P.Q. 288 (S.D.N.Y., 1943), cited in *Fortnightly*, 392 U.S. at 398, n. 23, 88 S.Ct. 2084, for the proposition that "broadcasters perform." The system's function in this regard is no longer merely to enhance the subscriber's ability to receive signals that are in the area; it is now acting to bring signals into the community that would not otherwise be receivable on an antenna, even a large community antenna, erected in that area.

In *Fortnightly*, the CATV system distributed the programs to an audience to which they would not otherwise have been presented. But the Court did not find this fact significant for copyright

purposes. The Court found that the CATV system made these programs available to this new audience by providing it with the services of an advanced antenna. It then reasoned that, since a television viewer was privileged to view whatever programs he could receive using any available antenna, a CATV system should not be deemed a "performer" for copyright purposes when it provided this antenna service as a commercial venture. When a distant signal is involved, CATV is again distributing television programming to a new audience that could not otherwise have viewed it. However, in this case, the new audience is one that would not have been able to view the programs even if there had been available in its community an advanced antenna such as that used by the CATV system. The added factor in such a case is the signal transmitting equipment, such as microwave links, that is used to bring the programs from the community where the system receives them into the community in which the new audience views them. The viewer's ability to receive the signal is no longer a product solely of improved antenna technology; rather, it results from the system's importation of the signal into the CATV community from a separate, distant community.

As a result, we no longer have a system that "no more than enhances the viewer's capacity to receive the broadcaster's signals." *Fortnightly*, p. 399, 88 S.Ct. p. 2089. We hold that when a CATV system imports distant signals, it is no longer within the ambit of the *Fortnightly* doctrine, and there is then no reason to treat it differently from any other person who, without license, displays a copyrighted work to an audience who would not otherwise receive it. For this reason, we conclude that the CATV system is a "performer" of whatever programs from these distant signals that it distributes to its subscribers.

There remains, however, the difficult problem of defining what is a distant signal. The range of a television signal is a function of many factors, including the current state of broadcast and reception technology. Some of these factors, such as topography, are unchanging in a particular area. But broadcast and reception technology are in a constant state of flux. Moreover, in determining the range of a broadcast signal, it may not be enough to say that the signal is or is not receivable in the community served by the CATV system. The fact that the signal can be received may not be meaningful unless it can project an image that is acceptable according to industry norms.

Thus, it seems clear that a precise judicial definition of a distant signal is not possible. The FCC, for purposes of the CATV signal-carriage requirements, at one time categorized signals as "distant" and "local" in terms of their ability to be received a substantial portion of the time by a substantial portion of the homes in the area by means of home antennas.[15] However, we find this definition unsuitable for copyright purposes because we believe that any definition phrased in terms of what can be received in area homes using rooftop antennas would fly in the face of the mandate of *Fortnightly*. Thus, in the absence of legislation on this matter, we must undertake to establish some standard for determining what is a distant signal for copyright purposes.

 Any determination that a particular television signal is "distant" must, of course, be made with respect to

---

15. This was phrased in terms of the Grade B contour, which marks the boundary along which acceptable reception of the signal is expected to be available 90 percent of the time at the best 50 percent of the locations. See 47 C.F.R. §§ 73.683 and 73.684. With respect to locations outside its Grade B contour, a signal was considered a "distant signal" by the FCC. Recently the FCC has promulgated regulations that give a broader definition of distant and local signals for purposes of the signal-carriage requirements of CATV systems. 47 C.F.R. §§ 76.59, 76.61, and 76.63. See 37 Fed.Reg. 3263 (Feb. 12, 1972).

its proximity to a specific local area, which we have termed the CATV community, served by the CATV system and designated in a franchise issued to it by a state or local government body or regulatory authority.[16] To say that a particular signal is already in the community, which is to say there is no need to import it through a relay or retransmittal device (such as microwave, cable, satellite, or the like), is to indicate that it can be received in the community during a substantial portion of the time by means of an antenna, such as a large community antenna or other receiving device, that is available under current technology. Thus, the meaning of "distant signal" must be determined in light of the current broadcasting and receiving technology. In this regard, we find that it is easier to state what is not a distant signal than to state what is a distant signal. Accordingly, we have concluded that any signal capable of projecting, without relay or retransmittal,[17]

an acceptable image that a CATV system receives off-the-air during a substantial portion of the time by means of an antenna erected in or adjacent to the CATV community is not a distant signal. This seems to us to be required by *Fortnightly*.

When the community from which the signal originates, which we term the originating community, and the CATV community are different, and when the signal is initially received by the system at a location in or near the originating community and then transmitted to the CATV community by microwave or cable, a strong presumption arises that it is a distant signal. The alleged infringer is then under a heavy burden to show that the signal is not a distant signal—that is, that it would be equally receivable off-the-air in the first instance and would project an image of similar quality, if there were substantially similar receiving equipment located in or adjacent to the CATV communi-

16. The franchise represents a grant to the CATV system of authority to run its cables through the public streets and facilities of a city, town, or county to the homes of its subscribers.

Almost 5,000 such franchises have already been granted, with the number continuing to increase. See Barnett, State, Federal and Local Regulation of Cable Television, 47 Notre Dame Lawyer 681, 702 (1972). Although the franchises have for the most part been issued by local authorities such as cities and towns, at least five states (Connecticut, Nevada, Rhode Island, Vermont, and Hawaii) have in effect laws subjecting CATV to state regulation, and more appear to be in the process of enacting such state regulatory schemes (e. g., Massachusetts, Illinois, New York and New Jersey), probably because of the disadvantages associated with local as compared with state regulation, id. at 698–708. Hence it may be anticipated that some state agencies may, as part of their new regulatory schemes, create local franchise areas or regions within the state based upon community of interest and population concentrations, as has been done by Connecticut. Id. 701–02.

As used by us, the term "CATV community" is limited strictly to the specifically designated local area for which the

franchise is granted by the state or local authority, which may not be expanded or enlarged by interconnection, merger of two or more franchised areas, or other means. We do not have before us, and thus do not consider, the hypothetical case in which the area for which the franchise is granted is not local, but state-wide or comprising a broad region. We are aware of no such franchises presently granted or under consideration. For the moment, we can say that the "CATV community" we envision is essentially a local entity, the parts of which share substantial common interests.

17. By "relay or retransmittal," we do not mean the authorized rebroadcast of the signal by a translator station, or the like. See note 19, *infra*, and accompanying text, where we indicate that the mere use of a translator does not, without more, make the signal a "distant signal," as that term is used in this opinion. It should be noted that microwave transmission, in the context of CATV distant-signal importation, does not constitute a broadcast or a rebroadcast. "Broadcasting" is defined at 47 U.S.C. § 153(*o*) as "the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations."

ty. Unless this burden is met, the signal should be deemed a distant signal, and the CATV system would not be within the ambit of *Fortnightly* with respect to that signal.

Similarly, when the signal is initially received by the CATV system on an antenna or other receiving device located between the originating community and the CATV community, the signal should be deemed a distant signal in the absence of a contrary showing by the CATV system. We do not necessarily mean that the antenna or receiving device on which the signal is initially received cannot in any case be located outside the city limits of the community that has franchised the CATV system. We can envision various legitimate circumstances, such as the desire to take advantage of a tall building, hill, or other topographical feature, that might cause the system to desire to locate its antenna or receiving device in an area closely neighboring the community that it serves. Such an antenna placement is not motivated by the desire to be closer to the signal's point of origin in order to receive it before its strength is dissipated and then to transmit to another location—presumably the motive that ordinarily underlies a system's decision to locate its antenna outside the community that it serves. Therefore, we would treat such a case in the same manner as those in which the antenna is located within the CATV community. However, we wish to make clear that the distances we envision here are small, and that any system that locates its antenna more than a few miles from the CATV community should bear the burden of showing that the signals it receives and distributes are not in fact distant signals.[18]

## VI. *Conclusion*

In light of what we have said, we conclude that the CATV systems in New York City and Elmira were properly held not subject to copyright liability. In the case of New York City, it was stipulated that the Teleprompter system did not at any time import distant signals. As to Elmira, although it appears that the system did import and distribute one distant signal from New York City, it is stipulated that none of the programs at issue involving alleged copyright infringement were carried by that station. The remaining stations distributed by the Elmira system were stipulated to have been received by an antenna located on a hill directly neighboring the city, and were thus not distant signals. Therefore, the Elmira system was properly held not subject to copyright liability with respect to programming carried on these signals.

On the other hand, the Rawlins CATV system imported five Denver stations from a distance of 184 miles. It was on these Denver stations that the programs at issue were carried. The system received these stations on an antenna located 90 miles from Denver. Therefore, we conclude that these Denver signals were presumptively distant signals and that, in distributing the pro-

18. Teleprompter has argued that it is insulated from copyright liability by a license implied in law. This court explicitly rejected this argument in our *Fortnightly* decision. United Artists, Inc. v. Fortnightly Corp., 377 F.2d 872, 880–884 (2d Cir. 1967), rev'd. 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). The Supreme Court in *Fortnightly* refused to embrace this argument when it rejected the Solicitor General's proposed compromise resolution of that case, although it did not necessarily reject this line or reasoning. See 392 U.S. 401–402, 88 S.Ct. 2084. Teleprompter argues that the terms of our decision on this issue in *Fortnightly* would not necessarily apply to the facts presented by three of the five CATV systems involved here—Elmira, New York City, and Farmington. In light of our resolution of this case, we need not deal with this contention with regard to the Elmira and New York City systems. As to the Farmington system, our decision with regard to the Albuquerque stations obviates the necessity to consider the license-implied-in-law issue. *See* Part IV, *infra*. On the matter of the Durango station, *see* note 20, *infra*. In other respects, we decline to re-examine our prior decision on this issue in *Fortnightly*.

grams carried on these stations, the Rawlins system "performed" the copyrighted programs and thereby infringed appellants' copyrights. For the same reason, we hold that the Great Falls system "performed" the copyrighted programs, which were distributed to subscribers through the importation of a signal originating in Spokane, Washington (284 miles from Great Falls) and received by antennas located 55 and 67 miles from Spokane.

The Farmington system provides potentially the clearest example of distant signal importation, in that signals originating in Los Angeles, California, 600 miles away, were distributed to subscribers. Only one of the Los Angeles stations broadcast any of the copyrighted programs at issue. Inasmuch as this station was received off-the-air by an antenna located a substantial distance from Farmington and then transmitted to the Farmington CATV system for distribution, it is presumptively a distant signal under our holding, and Teleprompter must be held to have "performed" the copyrighted program. The other alleged infringements relate to programs that were carried by stations located in Albuquerque (144 miles) and Durango, Colorado (43 miles). These signals were received by the CATV system on an antenna located on a mesa 30 miles outside of Farmington. We believe that a distance of 30 miles is too great to sustain an assertion that the antenna is adjacent to the CATV community. Instead, on these facts, we must treat the system as one that has located its antenna outside the CATV community. Thus, in the absence of a contrary showing by Teleprompter, these signals should also be deemed distant signals and the system should be held to have "performed" the copyrighted programs and thereby infringed the copyrights.

Of course, each system deemed to have imported distant signals must be afford-ed an opportunity to show that, although the receiving antenna was located outside the CATV community, the particular signal could have been received in a similar fashion by an equivalent antenna located in or adjacent to the CATV community. We seriously doubt that the Rawlins and Great Falls systems could sustain this heavy burden because of the great distances involved. Similarly, it is doubtful that the Farmington system will be able to make such a demonstration with regard to the Los Angeles station. However, the Farmington system may be in a somewhat better position with regard to its carriage of the Albuquerque and Durango stations. The alleged infringement resulting from this activity concerned programming broadcast by two CBS affiliates—one from Albuquerque and one from Durango. The parties have stipulated that

"[p]ursuant to permission granted by CBS and by [the Albuquerque affiliate], the signals [of the affiliate] . . . were rebroadcast [by a translator system] located near Farmington . . . All of the signals embodying the programs as to which infringement by the Farmington CATV is alleged . . . were rebroadcast by these translators."

It was further stipulated that, as a result of these translators, "[t]hese signals . . . could be received by residents of Farmington on rooftop antennas."

From these facts, we conclude, without the need for further showing by Teleprompter, that these Albuquerque stations could have been received by a CATV antenna located within Farmington of substantially similar sophistication to that erected on the mesa. Thus, it is clear that the Albuquerque stations were not distant signals, and there is no need to remand to the district court for findings on this point.[19] On the other

---

19. Although these signals were receivable because they were rebroadcast by translators, our earlier statement of the govern-ing standard, "that any signal capable of projecting, without relay or transmittal, an acceptable image that can be reached

hand, the stipulation indicated that the signals of the Durango affiliate were not rebroadcast and could not be received by means of rooftop antennas. Thus, if the system is unable to demonstrate that the Durango station is not a distant signal, it must then be regarded as a "performer" of the programming distributed to subscribers on that station. Since the copyrighted programs were distributed to subscribers on both the Albuquerque and the Durango stations, this leads to the conclusion that the Farmington system was a "performer," and thereby infringed the copyright, when it distributed the programs on the Durango station, but was not a "performer," and did not infringe, when it distributed the same programs on the Albuquerque station.[20] Although this result is somewhat lacking in symmetry, in the final analysis it will probably result in minimal damages, if any, being imposed on the Farmington CATV system; for we find it hard to see what damages appellants can have sustained, or what profits Teleprompter earned, from the carriage of the Durango broadcasts in light of the system's simultaneous non-infringing distribution of the programs on the Albuquerque CBS affiliate. By the simple turn of a knob, the viewers who saw the programs on the Durango station could have viewed them, as a result of the efforts of the same CATV system, on the Albuquerque station. However, we think that, unless the Durango station is shown not to have been a distant signal, there was at least a technical infringement of the copyright with regard to that station.

Accordingly, in light of our disposition of the issues on this appeal, we affirm the district court's holding that Teleprompter's Elmira and New York City CATV systems did not infringe appellants' copyrights; we reverse the district court's decision with regard to Teleprompter's Rawlins, Great Falls, and Farmington CATV systems, without prejudice, however, to Teleprompter to proceed in the district court within a reasonable time to show that any of these systems did not in fact import distant signals; and we remand to the district court for further proceedings, including the determination of damages, as are not inconsistent with this opinion.

The complex problems presented by the issues in this case are not readily amenable to judicial resolution. As the Supreme Court said in *Fortnightly*, "[w]e [must] take the Copyright Act of 1909 as we find it," and do the best we can. We hope that the Congress will in due course legislate a fuller and more flexible accommodation of competing copyright, anti-trust, and communications policy considerations, consistent with the challenges of modern CATV technology.

Affirmed in part and reversed and remanded in part.

---

off-the-air . . . by means of an antenna . . . erected in or adjacent to the CATV community is not a distant signal," does not make the Albuquerque stations distant signals. We were not referring to an authorized rebroadcast of the signal.

20. We do not believe that the carriage of the Durango stations falls within our reservation of decision in *Fortnightly* on the issue of license implied in law, since the Durango station's broadcasts were not receivable off-the-air by means of rooftop antennas in Farmington. See 377 F.2d at 884.